# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **RETIREE, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| vs. ) | Case No. 12-2079-JAR |
| ) | |
| **DANA ANSPACH, and** ) | |
| **SENSIBLE MONEY, LLC,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction and for Injunction Hearing (Doc. 19). The Court held an evidentiary hearing on Plaintiff's motion, and the parties have filed post-hearing briefs. For the reasons set forth below, the Court finds that Plaintiff's motion for preliminary injunction shall be granted.

## I.   Background

Plaintiff, Retiree, Inc. ("Retiree"), filed its Complaint against Defendants, Dana Anspach ("Anspach") and Sensible Money, LLC, to enjoin Defendants from their alleged continuing violation of the April 7, 2011 Confidentiality, Non-Compete, and Invention Ownership Agreement (the "Agreement") and to enforce the liquidated damages provision contained in the Agreement. Specifically, in Count I Retiree seeks a temporary and permanent injunction barring Defendants from the continued use of the Sensible Money website in its current form and from all marketing and promotional efforts, including the dissemination of written materials, which incorporate the alleged proprietary and confidential information Anspach obtained from Retiree, plus attorneys' fees and costs. Under Count II, Retiree alleges breach of contract and seeks

damages pursuant to the Agreement's liquidated damages clause, which authorizes Retiree to recover $250,000 for each breach of the Agreement. Retiree's motion for preliminary injunction seeks to enjoin Defendants from violating the Agreement.

**II.     Standard**

A preliminary injunction is an extraordinary remedy that is granted as the exception rather than the rule.[1] The primary purpose of a preliminary injunction is to preserve the status quo pending a trial on the merits.[2] To obtain a preliminary injunction, the moving party must show a clear and unequivocal right to relief.[3] Plaintiff must show: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public's interest."[4] In cases where the movant has prevailed on the other factors, the Tenth Circuit generally uses a liberal standard for "probability of success on the merits," so the moving party need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."[5]

There are three types of injunctions that are disfavored in the Tenth Circuit, and thus, are

---

[1] *Hill's Pet Nutrition, Inc. v. Nutro Prods., Inc.*, 258 F. Supp. 2d 1197, 1204 (D. Kan. 2003) (citation omitted).

[2] *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 976 (10th Cir. 2004) (en banc), *aff'd*, 126 S. Ct. 1211 (2006).

[3] *SCFC ILC, Inc., v. Visa USA*, 936 F.2d 1096, 1098 (10th Cir. 1991).

[4] *Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (citing *Chamber of Commerce v. Edmondson,* 594 F.3d 742, 764 (10th Cir. 2010) (internal quotation marks omitted); Fed.R.Civ.P. 65).

[5] *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980) (internal quotations omitted).

2

subjected to a heightened burden. Those injunctions are: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits.[6] If an injunction falls into one of these categories, it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. Furthermore . . . movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard."[7]

**III.   The Agreement**

The Agreement, executed by Retiree as "Owner" and Anspach as "Recipient," has an effective date of April 7, 2010, and provides in relevant part as follows:

> 1. Recipient acknowledges that during the period of this agreement, Owner may disclose to Recipient certain confidential and proprietary information concerning, without limitation, trade secrets, software products, software designs, specifications, processes, plans, or other ideas or inventions relating to the financial services industry ("Confidential Information")
> 2. Recipient agrees that the Confidential Information is to be considered confidential and proprietary to Owner and Recipient shall hold the same in confidence, shall not use the Confidential Information other than for the purposes of its business with Owner, and shall disclose it only to its officers, directors, or employees with a specific need to know. Recipient will not disclose, publish or otherwise reveal any of the Confidential information received from Owner to any other party whatsoever except with the specific prior written authorization of Owner.
> 3. The duties of this Agreement extend to the use of any content produced by Recipient for, or on behalf of, Retiree Inc. or its subsidiaries. Use of any such content that can be leveraged for any other source, even if such content is

---

[6]*O Centro*, 389 F.3d at 975.

[7]*Id.* at 975–76.

3

wholly a part of the public domain in published, publicly available documents, must be pre-approved by Owner prior to publication.

. . . .

6. For a period of five (5) years from the effective date of this Agreement, Recipient will not divert or attempt to divert from Owner any business Owner has enjoyed or solicited from its customers.
7. In the event of a breach or threatened breach by Recipient of any of the provisions of this Agreement, Recipient agrees that Owner—in addition to and not in limitation of any other rights, remedies, or damages available to Owner at law or in equity—shall be entitled to a permanent injunction in order to prevent or restrain any such breach by Recipient or by Recipient's partners, agents, representatives, servants, Recipients and/or any and all persons directly or indirectly acting for or with Recipient.
8. Liquidated Damages: Because the damages the Owner will suffer as a result of a violation of the covenants contained in paragraphs above are difficult, if not impossible, to calculate, the Recipient shall be obligated to pay to the Owner liquidated damages of $250,000 for each violation of covenants in this agreement. Since a violation of the covenants may not only result in a loss attributable to a specific transaction but also to the goodwill and enterprise value of the Owner, the amount of liquidated damages represents a reasonable estimate of the Owner's damages. In the event of a breach or threatened breach by Recipient of any of the provisions of this Agreement, Recipient agrees to the amount of liquidated damages payable for each violation of the referenced covenants above and represents that the amount of liquidated damages payable for each violation are a fair, reasonable, and negotiated approximation of the damages that would be sustained by the Owner which are otherwise difficult to establish.
9. Enforcement: The losing party agrees to pay to the prevailing party all costs, including attorneys' fees, incurred in enforcing this agreement.[8]

---

[8]Hearing Ex. 1.

4

**IV.     Discussion**

Retiree has developed a sophisticated business model based on a unique methodology increasing the amount and longevity of a client's retirement assets. William Meyer, controlling shareholder, CEO, Chairman and President of Retiree ("Meyer"), testified extensively about his background and expertise, as well as the expertise of others, including Dr. Bill Reichenstein, whom he collaborated with to develop the distinctive business model utilized by Retiree. The model, which is embodied in and expressed through Retiree's Excel spreadsheet, coordinates: 1) Social Security claiming strategies to maximize the amount of such benefits and, concomitantly, to reduce the amount of income tax payable with respect to such benefits; 2) asset location by which different types of assets are located in accounts that will reduce the tax payable on distributions; 3) asset allocation by which a desirable risk profile is maintained for a client's investments (depending on a client's age and circumstances), which includes the re-balancing of client assets over time to maintain a correct asset allocation; 4) withdrawal sequencing—the sequencing, or ordering, of distributions of assets to achieve the most favorable income tax treatment for a client; and 5) a consistent focus on tax minimization.

Each of the five coordinates represents a complex specialization, and the coordination of them makes it exponentially more complicated. In contrast to the financial industry's focus on accumulation, Retiree has researched, formulated, and implemented a unique business plan oriented on the maximization and longevity of retirement assets with a particular focus on Social Security and tax minimization. Without focusing on investment returns, Retiree focuses on the tax-sensitive drawdown of a client's assets to increase the availability of these assets over a protracted retirement period. Meyer testified that there are over 500,000 permutations in the

ways that someone can take Social Security. Retiree has a patent pending on an algorithm to maximize Social Security benefits and to coordinate it with how someone withdraws in a tax-efficient way.[9]

In February, 2011, Defendant Anspach was working as a financial planner in the Phoenix area at Wealth Management Solutions. Her practice focused on accumulation and traditional financial consulting, and utilized the Excel spreadsheet that was admitted as Exhibit 11. This spreadsheet compared a client's projected annual spending to the client's projected annual income to determine "What's Your Number?" — the possible gap between expenditures and available resources. It did not calculate how annual decisions involving Social Security, asset location, and sequencing could impact a retiree's tax liability, which would, in turn, impact the amount and longevity of a retiree's assets. The Wealth Management Solutions website did not lead visitors to a landing page, nor did it offer a free report or reflect a coordinated, tax-sensitive decumulative approach.

In February 2011, Anspach and Meyer began discussions about Anspach working with and owning shares in Retiree. The parties executed the Confidentiality Agreement on April 7, 2011, and provided for an effective date of April 7, 2010. During this period of her affiliation with Retiree, Anspach was exposed to Retiree's confidential information, including Retiree's Excel spreadsheets, documents, processes, methods and marketing strategies. Anspach decided not to work with Retiree in July, 2011, and created Defendant Sensible Money, LLC, featuring tax-minimizing drawdown strategies coordinated with Social Security. Anspach ended her affiliation with Retiree in November, 2011.

---

[9] *See* Hearing Ex. 96.

Retiree alleges that prior to her affiliation with Retiree, Anspach provided guidance and consulting services in connection with retirement planning, she dealt principally with accumulation (rather than withdrawal) concerns, and she had not developed coordinated, tax-efficient methodologies for timing and sequencing the maximal use of retirement and Social Security concerns. Retiree argues that after her affiliation with Retiree terminated, Anspach and her wholly-owned affiliate, Sensible Money, LLC, began marketing themselves as experts in tax-efficient withdrawal methodologies combining retirement and Social Security resources and utilizing the proprietary information developed by Retiree.

Although Defendants provided retirement and financial planning services before affiliating with Retiree, both now use tax-minimizing draw down strategies coordinated with Social Security. Defendants point to the differences between their approach and Retiree's: 1) Defendants' spreadsheets are not as detailed as Retiree's description of its big Excel spreadsheet; 2) Defendants have to manually go in and try different withdrawal strategies by typing in different numbers, as opposed to using algorithms like Retiree; 3) Defendants do not use after-tax allocations; and 4) Defendants do not use Retiree's Social Security algorithm, and instead use a calculator developed by another software provider.

Retiree argues that whether Defendants use a before-tax or after-tax asset allocation formula is insignificant in comparison to the fact that Anspach's spreadsheet now uses asset allocation and imputed returns; her pre-Retiree spreadsheet (Ex. 11) did not incorporate asset allocation. Furthermore, Retiree argues that Anspach was exposed during her association with Retiree to both before-tax and after-tax methodologies. Likewise, Anspach's pre-Retiree spreadsheet did not contain Social Security calculations—it did not coordinate Social Security

7

claiming decisions with the sequencing of distributions from specific assets located in particular accounts.

Retiree must show that Defendants are using its confidential information; it is not required to show that Defendants are using the identical process that Retiree uses. Retiree argues that Defendants now provide a service that purports to optimize the longevity of a retiree's assets, and this optimization cannot occur without a spreadsheet—an analytical tool. Retiree argues that Defendants acquired— or learned how to build— their spreadsheet, and thus the heart of their newly formulated business model, from Retiree.

Retiree claims that the foundation of its intellectual property is two related Excel spreadsheets that have taken experienced and known industry experts more than five years to develop. The detailed "Big" Excel model ("Big Model") was not given to Anspach, but Retiree showed her the model. Meyer testified that only four people have ever seen the details of the Big Model, which consists of algorithms, math on how to coordinate the five elements, and how they are delivered visually. The Excel Quickstart model ("Quickstart Model"), which evaluates Retiree's unique coordination strategies, was given to Anspach and her Sensible Money colleague and Excel modeler.[10]

Retiree not only furnished the Quickstart Model to Anspach and her Excel modeler, but Retiree also trained both on the intricacies of the spreadsheet. Anspach also participated in a Request for Proposal process in which the details of Retiree's system, reports, and Excel model were provided. Defendants point to the fact that Retiree provides its Quickstart spreadsheet model to its clients, and argues that therefore it has abandoned any claim to confidentiality.

---

[10]*See* Hearing Ex. 77.

Retiree argues that it furnished to its clients and prospects the results of the analysis produced by the Quickstart spreadsheet.

Retiree seeks an injunction, and more specifically, that all material created using Defendants' new Excel spreadsheet be removed and deleted; and that all planning presentations, speaking engagements, books, and articles leveraging the developed Excel model be enjoined. Defendants argue that Retiree fails to identify "the offending appropriated material" on Defendants' website or in their free report, because it believes that nothing on her website or in her free report could have been written without the use of its confidential information. Defendants point to the fact that Retiree alleged that Anspach used his confidential information in some of her writings, although she proved that they were actually written before she met Meyer. Defendants further try to discredit Meyer by pointing to his deposition testimony where he allegedly mistakenly indicated that certain spreadsheets belonged to Defendant.

Retiree argues that it has developed a unique retirement planning internet marketing approach using Google search terms most likely employed by prospective clients and a "landing page" that leads to the generation of free reports and obtains significant "leads." Retiree's branding includes the tag line "Get More." Retiree argues that Sensible Money's website focuses on withdrawal strategies and that the philosophy and associated components of Asset Allocation, Asset Location, Withdrawal Sequencing, Social Security, and taxes are pervasive throughout the site. In addition, Defendants' new Excel model is being used on the site on the case studies page and on for the free report. Retiree further argues that Defendants are using information from their new Excel model in professional presentations.

Retiree argues that although it took Retiree over five years using recognized national

experts to develop a similar Excel model and business plan, in six months (July, 2011 to January, 2012), Anspach commenced a new business without a detailed plan, launched a website, created a new marketing strategy, all built off the positioning and advice from an Excel model. Retiree argues that Anspach's exposure to Retiree's proprietary material aided her in the development of her new business, marketing, and the Excel model she now uses to manage clients, craft marketing materials, and promote her new approach at industry events.

**Irreparable Harm**

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"[11] Irreparable harm is more than "merely serious or substantial" harm.[12] This requirement is met by a plaintiff demonstrating that there is a significant risk of harm that cannot be cured by monetary damages.[13] The party seeking the preliminary injunction bears the burden to show that "the injury complained of is of such imminence that there is a clear and present need for equitable relief."[14] Irreparable harm is the most important factor in obtaining a preliminary injunction.[15] "Loss of customers, loss of goodwill, and threats to a business' viability have been found to constitute irreparable harm."[16] Unfair competition resulting from a

---

[11]*Heidman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir.1985)).

[12]*Id.* (quoting *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1235, 1250 (10th Cir. 2001)).

[13]*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (citations omitted).

[14]*Heidman*, 348 F.3d at 1189.

[15]*Hill's Pet Nutrition, Inc. v. Nutro Prod., Inc.*, 258 F. Supp. 2d, 1197, 1205 (D. Kan. 2003).

[16]*Id.*

10

breach of covenant not to compete is likely to constitute irreparable harm.[17] On the other hand, wholly conclusory statements alone will not constitute irreparable harm.[18]

Retiree has demonstrated that it is suffering a harm that cannot be cured by monetary damages. Furthermore, this Court has held that:

> "Certainly, if the disclosure allows a competitor to cut corners in the research and development process . . ., the competitor will attain a competing product . . . much sooner, and it is this harm . . . that is irreparable."[19]

The Court finds that Retiree has shown irreparable harm.

**Balancing the Hardships/Public Interest**

After determining the harm that would be suffered by the moving party if the injunction is not granted, the court must then weigh that harm against the harm to the defendant if the preliminary injunction is granted.[20] If this preliminary injunction is not granted, Retiree may continue to suffer irreparable harm due to disclosure of its confidential information.[21] The Court is not persuaded that Defendants will suffer irreparable harm if they are precluded from using Retiree's confidential information pending trial. Anspach had a successful business prior to her affiliation with Retiree and has not shown how limiting her use of Retiree's confidential

---

[17]*Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992).

[18]*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004).

[19]*Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1150 (D. Kan. 2007) (quoting *Interbake Foods, LLC v. Tomasiello*, 461 F. Supp. 2d 943, 975 (N.D. Iowa 2006) (explaining that the disclosure of trade secrets may cause irreparable harm)).

[20]*Preminger v. Principi*, 422 F.3d 815, 823 (9th Cir. 2005); *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); *Manning v. Hunt*, 119 F.3d 254 (4th Cir. 1997); *Aluminum Workers Intern. Union, AFL-CIO, Local Union no. 215 v. Consol. Aluminum Corp.*, 696 F.2d 437, 444 (6th Cir. 1982).

[21]*Nike, Inc. v. McCarthy*, 379 F.3d 576, 587 (9th Cir. 2004) (a party can show potential harm of unfair competition where former employer has knowledge of confidential information peculiar to his former employer's products).

information will cause irreparable harm. Fed. R. Civ. P. 65(c) requires a plaintiff to post a bond in an amount the Court deems appropriate to protect the defendant from losses and damages if, in the end, defendant was wrongly enjoined. The Court, however, has the discretion to dispense with the bond where the applicant for the injunction has "considerable assets" and is "able to respond in damages" if the defendant is wrongly enjoined.[22] It appears that Retiree has considerable assets and that a bond is unnecessary in this case. However, Defendants may move for a bond requirement if they deem it necessary and present evidence in support.

Next, the Court considers the harm to the public interest if the preliminary injunction is granted. Generally, there is a public interest in upholding enforceable contracts.[23] Moreover, the public interest is served where unfair competition is restrained.[24] The Court finds that the public interest will not be harmed if a preliminary injunction is granted in this case.

**Likelihood of Success on the Merits**

In cases where the movant has prevailed on the other factors, the Tenth Circuit generally uses a liberal standard for "probability of success on the merits," so the moving party need only raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."[25] The Court finds that Retiree has met its burden of showing a probability of success on the merits.

**V.   Conclusion**

---

[22] *Monroe Div., Litton Bus. Sys., Inc. v. De Bari*, 562 F.2d 30, 32 (10th Cir. 1977).

[23] *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1109 (D. Kan. 2000); *Hearton, Inc. v. Shackelford*, 898 F. Supp. 1491, 1502 (D. Kan. 1995).

[24] *Shackelford*, 898 F. Supp. at 1502; *Am. Fid. Assurance Corp. v. Leonard*, 81 F. Supp. 2d 1115, 1121 (D. Kan. 2000).

[25] *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980) (internal quotations omitted).

The Court finds that Retiree has met its burden of showing a likelihood of success on the merits; a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in the movant's favor; and that the injunction is in the public's interest.  Retiree seeks to have all material created using Defendants' new Excel spreadsheet[26] removed and deleted, and to enjoin all planning presentations, speaking engagements, books, and articles leveraging the developed Excel model.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion for Preliminary Injunction (Doc. 19)  is **GRANTED.**

**IT IS FURTHER ORDERED BY THE COURT** that Defendants shall discontinue use of their current Excel spreadsheet and remove all material on their website that was created using the spreadsheet, in particular their case studies page and The Free Report.  Defendants are further enjoined from utilizing the developed Excel model in presentations, speaking engagements, books, and articles.  Defendants are further enjoined from using Social Security claiming strategies that they were exposed to while working with Retiree.

**IT IS SO ORDERED**.

Dated: <u>July 23, 2013</u>

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[26]*See* Hearing Exs. 300–304.