## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **RETIREE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-2079-JAR** |
| | ) | |
| **DANA ANSPACH, and** | ) | |
| **SENSIBLE MONEY, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| ———————————————— | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Plaintiff Retiree, Inc.'s ("Retiree") Complaint

against Defendants Dana Anspach ("Anspach") and Sensible Money, LLC, seeking to

permanently enjoin Defendants from violating the parties' confidentiality and non-compete

agreement (the "Agreement") and to enforce the liquidated damages provision contained in the

Agreement.  Specifically, in Count I Retiree seeks a permanent injunction barring Defendants

from the continued use of the Sensible Money website in its current form and from all marketing

and promotional efforts, including the dissemination of written materials, which incorporate the

alleged proprietary and confidential information Anspach obtained from Retiree, plus attorneys'

fees and costs.  Under Count II, Retiree alleges breach of contract and seeks damages pursuant to

the Agreement's liquidated damages clause, which authorizes Retiree to recover $250,000 for

each breach of the Agreement. The Court previously held an evidentiary hearing on Retiree's

Motion for Preliminary Injunction, and entered a Memorandum and Order granting the Motion

for Preliminary Injunction (Doc. 51).  The Court subsequently held a bench trial to determine

whether a permanent injunction and liquidated damages should be awarded.  Retiree has also

filed a Motion for Contempt (Doc. 57), moving the Court to hold Anspach in contempt for violation of the Court's preliminary injunction.

I.    **Findings of Fact**

The Court's Memorandum and Order (Doc. 51) sets forth the facts underlying this action and the Court will not restate them, but rather will incorporate them and only set forth additional evidence presented at trial.

This action arises from the confidentiality and non-compete Agreement[1] between Retiree and Anspach, which they entered into during the period in which they unsuccessfully negotiated an employment agreement for Anspach to join Retiree and merge her financial planning business with Retiree's financial planning business.  During the approximate five months in which the parties negotiated the merger, Anspach had access to confidential information about the methodology and practices of Retiree's comprehensive and integrated financial planning process, and had some exposure to Retiree's proprietary financial planning software.  Retiree's principal, William Meyer, and Anspach had numerous discussions about the commonalities of their financial planning practice; they both focused on individuals at or nearing retirement.  They also had numerous discussions about the differences in their financial planning practice; while Anspach focused on more common and traditional retirement planning strategies, Meyer focused more on "decumulation" strategy.  In contrast to the financial industry's focus on accumulation, Retiree has researched, formulated and implemented a unique business plan oriented on the maximization and longevity of retirement assets with a particular focus on Social Security and tax minimization.  Without focusing on investment returns, Retiree focuses on the tax-sensitive

---

[1]The Agreement, executed by Retiree as "Owner" and Anspach as "Recipient," has an effective date of April 7, 2010, and is set out in this Court's Memorandum and Order granting a preliminary injunction. (Doc. 51).

2

drawdown of a client's assets to increase the availability of these assets over a protracted retirement period.

The financial planning industry has niches and specialities; Meyer and Anspach both focused on retirees.  Both Meyer and Anspach are accomplished in their field; both are authors, as well as speakers in demand at various seminars and conferences in the financial planning field.  However, Retiree occupies a unique position in the retirement industry; it is the first and most accomplished firm operating in the decumulation area with a focus on the coordination of Social Security claiming strategies, asset location, asset allocation, withdrawal sequencing and tax minimization.  Each of the five coordinates represents a complex specialization, and the coordination of them makes it exponentially more complicated.

Meyer focused far more on asset location and social security claiming strategies than Anspach did.  In fact, Meyer worked closely with Dr. William Reichenstein, CFA, PhD,  who is a leading authority on after-tax and before-tax asset allocation and tax-efficient withdrawal strategies and Social Security claiming strategies.[2]  Meyer considered the effect of various strategies on the taxation of Social Security benefits and thus taxation of all income, avoiding what he referred to as the "tax torpedo" caused when a retiree realized so much income that the taxation of his or her Social Security benefits leaped from 0% to 50% or 85%.  Meyer testified that there are over 500,000 permutations in the ways that someone can take Social Security.  Retiree has a patent pending on an algorithm to maximize Social Security benefits and to coordinate it with how someone withdraws in a tax-efficient way.[3]  Retiree also has a patent

---

[2]*See* Ex. 72.

[3]*See* Ex. 96.

pending regarding its use of its QuickStart Model on the web; and Retiree was awarded a patent dealing with the utilization of longevity hedging.

Nonetheless, Meyer and Anspach were interested in merging their practices for professional as well as personal reasons.  Professionally, they recognized that Anspach, a certified financial planner ("CFP") and Retirement Management Analyst ("RMA"),[4] had a healthy financial planning practice in the Phoenix, Arizona area, and national recognition as the top financial planning blogger with her "MoneyOver55" column on the  www.About.com website, which contributed to a growing client base in her financial planning practice.  Meyer and Retiree's success, on the other hand, was not in numbers of clients, but in the proprietary software he developed that allowed for a leading-edge approach to financial planning that integrated essentially all of the well-recognized components of retiree financial planning, and allowed a client to see, in real-time, how changing variables would affect their financial picture.  Retiree's product, as well as the processes and methodologies that underlay the product, gave it an edge over others in the field.  While institutional investment houses and others had developed a panoply of financial planning tools and products, none integrated all of the material elements into one product and none were able to produce financial planning information in the agile and visually comprehensive and digestible way that Retiree's software could.  Meyer and Retiree's business plan involved selling enterprise and user licenses for the software to institutions, as well as financial planners in the industry.

But this case is not about Anspach violating the confidentiality and non-disclosure contract by appropriating Retiree's software.  To be sure, Anspach had prolonged access to, and

---

[4]RMA is a professional certification for financial planners specializing in issues related to retirement by the Retirement Income Industry Association ("RIIA").

in fact worked with the Excel Quickstart Model of the software, in advising clients during the months that she and Retiree worked together as they anticipated an imminent merger. But the Quickstart Model did not contain most of the algorithms, formulas and details that were in Retiree's "Big Model." The Big Model was the product of five years of Meyer's development of processes and methodologies in collaboration with mathematicians and engineers who wrote algorithms and formulas and five years of software development by developers Meyers contracted with to produce the software.

Rather, this case is about Anspach violating the confidentiality and non-disclosure agreement by appropriating the processes and methodology that underlay Retiree's software and practices. While Anspach did not have full access to the Big Model, she had significant exposure to it, including participating in a five hour sales presentation Retiree made to American Funds, as it attempted to sell an enterprise license for American Funds' use of the software. During this five hour presentation, Anspach witnessed the Big Model in operation and was privy to detailed explanations that Retiree gave to American Funds regarding the details of the Big Model and the underlying processes. Retiree closely guarded this information; it entered into a confidentiality and non-disclosure agreement with American Funds and other potential clientele, as well as confidentiality and non-disclosure agreements with others who worked on the product, including the software developers. Retiree also limited exposure to the Big Model. Meyer testified that after five years of development, only six people have seen the Big Model.

Over the course of a four day Preliminary Injunction hearing in November, 2012 and January 2013, and a four day trial on the Complaint in November 2013, the Court heard much about Retiree's business, Anspach's business, the financial planning industry, and software

products produced and utilized by others in the financial planning industry. Much of Anspach's defense centered on the fact that there are common elements of financial planning with respect to retirees or those nearing retirement, and that Retiree's processes and methodologies were not unique, nor protectible as proprietary, confidential information. But, the strongest evidence that Retiree's processes and methodologies (not to mention its software) were in fact unique, novel and protectible, came from the pen and the voice of Anspach herself. In numerous emails, Anspach spoke of the novel, unique and cutting edge methodologies and processes of Retiree.[5] More notably, after the attempted merger failed, and after Anspach began developing or enhancing her own financial planning methodologies and tools (including a series of spreadsheets) that Retiree claims violated the confidentiality and non-disclosure agreement, Anspach began calling these notably similar methodologies and processes her own. Anspach also began claiming that these methodologies and processes that she claimed were her own were novel, unique and cutting-edge in the industry.

This trial centered around whether the post-merger methodologies, processes and tools Anspach claimed to develop on her own were in fact the product of her exposure to, and knowledge of certain confidential information of Retiree. There was abundant circumstantial evidence leading this Court to the conclusion that Anspach did violate the agreement with Retiree by using confidential information. First, when comparing the detail of Anspach's spreadsheets and the financial planning components that she considered and attempted to

---

[5]*See, e.g.*, Ex. 118 (On June 9, 2011, Anspach sent an email to her colleagues with the subject line "Announcement and Looking to Hire - Please forward along." The email announces her merger with Retiree and states: "The interest they have generated has been due to their proprietary methodology for a retirement income drawdown process that coordinates tax planning, investment planning and Social Security benefit decisions in a way that extends the life of a retiree's savings an additional 4 to 7 years over traditional drawdown plans.").

integrate with one another before the attempted merger and after, the evidence is compelling.

In February 2011, when Anspach first corresponded with Meyer, Anspach was using a spreadsheet entitled "What's Your Number?"[6]  It had two tabs and calculated the gap between spending needs projected over a period of time and the sources of funds available to finance those spending needs.  The function of the spreadsheet was to determine any gap between spending needs and available resources.  The spreadsheet utilized an imputed tax rate, did not accomplish tax efficient drawdown of assets, and did not reference detailed Social Security taxes.  Anspach's notes on the spreadsheet stated:

> "Envision simple tax calculation, that uses fixed income from line
> above, tax tables in next tab, and a few user input variables like
> filing status (married, single), and avg annual itemized deductions
> or standard deduction.  It then calculates ideal amount of income
> needed from assets that would come from tax-deferred vs. after tax
> buckets."

The spreadsheet also lacks asset allocation.  Anspach's note on the spreadsheet stated that "[t]his section would have some type of algorithm that would prefill into ideal allocation."  The spreadsheet also lacked asset location.  Anspach's notes on the spreadsheet provided a broad directive: "Any gap is being pulled from the bond bucket below."  The spreadsheet's lack of accurate federal tax and Social Security tax calculations prevented it from incorporating withdrawal sequencing.  Without asset allocation and detailed federal and Social Security taxes, there can be no tax efficient drawdown.

This "What's Your Number?" spreadsheet clearly had gaps— as evidenced by Anspach's notes on the spreadsheet—that she needed help to fill in.  By February 2011, Kim Morton and

---

[6]Ex. 11.

Anspach had worked together for six years in the retirement income industry.  Anspach had been exposed to RIIA materials since 2009, she obtained the RMA designation in 2010.  Thus, she was in a position to know what was going on in the retirement income industry.  At that time, Anspach was using ExecPlan, which could run a projection based on one set of assumptions and generate an analysis.[7]  The user would then have to input different assumptions and run another analysis and compare the two.  Unlike Retiree's side-by-side easy visualization, which Retiree considers to be a business and marketing attribute, Anspach's did not simultaneously show side-by-side comparisons nor generate a visualization that made it easy for clients to understand their options.

During Anspach's affiliation with Retiree, Meyer explained to Anspach that there is no magic algorithm, but rather spreadsheets are patched together with detailed tax calculations and the engine of the Excel Model is the control tab, which is combined with a base and an optimized tab.  The user inputs data into the spreadsheet and has the ability to modify the input.  The input is then fed into a base projections spreadsheet and an optimized projections spreadsheet.  The base and optimized spreadsheets are projections over a retiree's projected longevity or the coordination of a number of variables to determine how long a retiree's assets will last.  The control tab feeds information into the arms of the engine and then the arms feed back into the control tab the results of the projections.  The results of those projections allow the control tab to generate a visual side-by-side comparison.  This allows the user to vary input to adjust the base and optimized outcomes.  This was all shown to Anspach during her affiliation with Retiree.

---

[7]*See* Exs. 270, 271 (ExecPlan printouts).

Anspach decided not to join Retiree in July 2011.  On August 21, 2011, Anspach showed Meyer a more-evolved spreadsheet that she claimed to have created.[8]  This new spreadsheet coordinated Social Security taxes with a withdrawal strategy through projections contained in base and optimal tabs, and employed a side-by-side comparison.  Now Anspach has a control tab, which she calls the "interface tab."

Anspach's spreadsheet was even more detailed at the launch of her Sensible Money website in January 2012.  The final version of Anspach's spreadsheet was referred to as "Spreadsheet 2.0."  In correspondence from Anspach in June 2013, she discussed Spreadsheet 2.0 and claimed that it has "key differentiators" and that it does something no other tool does.[9]

Anspach demonstrated Spreadsheet 2.0 at the trial.  Defendants claim Spreadsheet 2.0 was cobbled together and not fully integrated.  Some tabs could be deleted without effect and the Free Report was unconnected to everything else in the spreadsheet.  Defendants point to the differences between Retiree's and Anspach's spreadsheets: Retiree's pdf printout is over 1,000 pages while Anspach's is 300 (and only 230 if abandoned tabs are not counted); Retiree's has fifty-nine tabs while Anspach's has twenty-four, only seven of which she actually uses; Retiree's has five to ten screens for inputting information while Anspach's has one; Retiree's calculates risk potential while Anspach's does not; Retiree's social security claiming strategies interact in its model while Anspach uses another social security calculator then puts the optimal strategy into her spreadsheet.   Anspach also argues that she has used publicly available information to create her spreadsheets.  However, she was exposed to Retiree's methodology of integrating

---

[8]Ex. 12.

[9]Exs. 714 and 715.

various information into the Big Model.

Another strong piece of circumstantial evidence is the timeline or evolution of the development of Anspach's spreadsheets.  Although it took Retiree over five years, using nationally recognized experts to develop a similar Excel model and business plan, in just six months (July 2011 to January 2012), Anspach commenced a new business without a detailed plan, launched a website, created a new marketing strategy; and her spreadsheets evolved from considering and evaluating two tabs in a non-integrated fashion, to considering and evaluating multiple components in a somewhat integrated fashion through the use of her interface tab, resulting in "key differentiators."  The Court finds that Anspach's exposure to and use of Retiree's confidential information has enabled her to accelerate the development and commercial exploitation of the Sensible Money spreadsheet.  Indeed, Anspach, in a series of emails with counsel and others, sought to investigate whether her spreadsheets could be protectible proprietary information as novel, unique and cutting-edge in the field.

Ironically, Anspach's defense included claims that her spreadsheet contained errors and was not as complete or detailed as Retiree's.  To be sure, Anspach's spreadsheets were not as complete, detailed or integrated as Retiree's.  But that is precisely the point of this action.  In a relatively short period of time, Anspach rapidly evolved her spreadsheets to a state that was inferior to Retiree's, yet was indicative of the fact that the spreadsheets were based on a new base of knowledge she had acquired from Retiree and was using in violation of the Agreement. Anspach lacked access to certain algorithms and formulas.  She lacked full access to the Big Model. Yet, in an abbreviated time, with her working knowledge and noted acumen in the financial planning field, she had managed to replicate parts of Retiree's spreadsheet, in substance

and in similar form and format.  This evidence leads the Court to a conclusion that Anspach did use certain confidential information in violation of the Agreement.

Anspach was given ample opportunity to review the Agreement prior to signing it.[10]  She requested two revisions to the document—to exclude Ms. Morton and another associate from the operation of the Agreement and to ensure that she could continue to service her existing clients in the event she did not remain with Retiree.[11]  She did not object to the liquidated damages clause or to the confidentiality provisions, and emailed that she was pleased to sign the document.[12]

Defendants place stock in the fact that Meyer did not attempt to enforce the Agreement when Anspach showed him the August 2011 spreadsheet and in December 2011 he vouched for her integrity.  However, Meyer and Anspach had a personal relationship that continued after the end of their business relationship.  Their personal communications ended, however, on December 24, 2011.

## II.    Conclusions of Law

There is no question that the parties entered into the Agreement, or that the Agreement provides for a permanent injunction and contains a liquidated damages clause.  The Court has also found that Anspach breached the Agreement.  Therefore, the only issue left for the Court to determine is whether the Agreement is enforceable under Kansas law.[13]

---

[10]Ex. 226.

[11]*Id.*

[12]*Id.*

[13]The Agreement provides that it shall be construed according to the laws of the State of Kansas.  Ex. 1 at ¶12.

A.  Restraint of Trade

Defendants argue that the confidentiality, non-disclosure and non-compete provisions are contrary to public policy because they constitute a restraint of trade.  The confidentiality and non-disclosure provisions prohibited Anspach from disclosing or using Retiree's Confidential Information other than for the purposes of her business with Retiree.  The non-compete provision in the Agreement provides that "[f]or a period of five (5) years from the effective date of this Agreement, Recipient will not divert or attempt to divert from Owner any business Owner has enjoyed or solicited from its customers."[14]  The effective date of the Agreement is April 7, 2010.[15]  Thus, the non-compete clause will expire on April 7, 2015.

"In Kansas, it is well recognized that a restrictive covenant in an employment contract will only be applied to the extent it is reasonably necessary under the facts and circumstances of the particular case."[16]  Reasonableness determinations are made on the particular facts and circumstances of each case, evaluating these factors:  "(1) Does the covenant protect a legitimate business interest of the employer?  (2) Does the covenant create an undue burden on the employee?  (3) Is the covenant injurious to the public welfare?  (4) Are the time and territorial limitation contained in the covenant reasonable?"[17]

Defendants argue that the Agreement is too general as to the type of information being protected, and cite *Puritan-Bennett Corp.*, for the proposition that "[h]iring agreements which

---

[14]Ex. 1 at ¶6.

[15]Ex. 1 at ¶13.

[16]*Puritan-Bennett Corp. v. Richter*, 679 P.2d 206, 210 (Kan. 1984) (citations omitted).

[17]*Weber v. Tillman*, 913 P.2d 84, 90 (Kan. 1996).

12

restrict communication of ideas in general, rather than purely trade secrets, have been held

unreasonable."[18]   However, the Court has emphasized that although some ingredients in

Retiree's processes are in the public domain, it is Retiree's product, as well as the processes and

methodologies that underlay the product, that were novel and unique, integrating all of the

components into a leading-edge approach that allowed the client to see, in real-time, how

changing variables affected their financial picture.  Retiree's Big Model and software are the

result of five years of development by experts in the field, Retiree has been awarded patents and

has patents pending.  Clearly, there was nothing "general" about Retiree's leading-edge

approach, and the covenants protect a legitimate business interest of Retiree.

Defendants also argue that a confidentiality agreement, whose sole purpose is to avoid

competition, rather than protect confidential information, is unreasonable and unenforceable,

citing *Weber v. Tillman*.[19]   However, the evidence shows that the purpose of the Agreement was

to protect and guard Retiree's confidential information—which it went to great effort to

accomplish—not solely to avoid ordinary competition.  There is a public interest in upholding

enforceable contracts.[20]   Moreover, the public interest is served where unfair competition is

restrained.[21]  Kansas courts have held that preventing trade secret disclosure in addition to

---

[18]*Puritan-Bennett*, 679 P.2d at 210.  Defendants also cite *Evolution, Inc. v. Suntrust Bank*, 342 F. Supp. 2d 943, 962 (D. Kan. 2004) for the proposition that reverse engineering is not evidence of an improper use of confidential information.  However, the issue in  *Evolution*  was whether or not the defendants used "improper means to acquire knowledge" within the meaning of the Trade Secrets Act.  The case is clearly distinguishable from this case, where Anspach gained her knowledge directly from Retiree and the parties entered into a nondisclosure and noncompete agreement.

[19]913 P.2d 84, 89 (Kan. 1996).

[20]*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F. Supp. 2d 1102, 1109 (D. Kan. 2000); *Hearton, Inc. v. Shackelford*, 898 F. Supp. 1491, 1502 (D. Kan. 1995).

[21]*Shackelford*, 898 F. Supp. at 1502; *Am. Fid. Assurance Corp. v. Leonard*, 81 F. Supp. 2d 1115, 1121 (D. Kan. 2000).

preventing use of the expertise learned to benefit a competitor, are both reasonable purposes.[22]

Furthermore, Retiree and Anspach were not competitors prior to their affiliation in February

2011.  Anspach had a successful business prior to her affiliation with Retiree, and Retiree has

acknowledged that Anspach is free to resume her prior financial planning practice in the Phoenix

area.  The Court finds that the Agreement's confidentiality, nondisclosure and noncompete

covenants are valid and enforceable and the restraint is reasonable under the circumstances and

not adverse to the public welfare.

### B.  Liquidated Damages

Defendants argue that the liquidated damages clause constitutes is a penalty that is

unenforceable as a matter of law.  The Agreement provides that:

> Liquidated Damages: Because the damages the Owner will suffer
> as a result of a violation of the covenants contained in paragraphs
> above are difficult, if not impossible, to calculate, the Recipient
> shall be obligated to pay to the Owner liquidated damages of
> $250,000 for each violation of covenants in this agreement.  Since
> a violation of the covenants may not only result in a loss
> attributable to a specific transaction but also to the goodwill and
> enterprise value of the Owner, the amount of liquidated damages
> represents a reasonable estimate of the Owner's damages.  In the
> event of a breach or threatened breach by Recipient of any of the
> provisions of this Agreement, Recipient agrees to the amount of
> liquidated damages payable for each violation of the referenced
> covenants above and represents that the amount of liquidated
> damages payable for each violation are a fair, reasonable, and
> negotiated approximation of the damages that would be sustained
> by the Owner which are otherwise difficult to establish.[23]

Prior to execution of the Agreement, Retiree made Anspach aware of the liquidated damages

clause and explained its significance.  Anspach was given ample opportunity to review and

---

[22]*Puritan-Bennett*, 679 P.2d at 212.

[23]Ex. 1 at ¶8.

discuss the Agreement.  Anspach did not object to the liquidated damages clause, although she objected to other provisions in the Agreement and successfully negotiated revisions to resolve those objections.

The policy under Kansas law "'is to permit mentally competent parties to arrange their own contracts and fashion their own remedies.'"[24]  Thus, parties may agree on liquidated damages "if the set amount is determined to reasonable and the amount of damages is difficult to ascertain."[25]

The Court finds that the use of a liquidated damages clause is particularly appropriate in this case because the damages suffered by Retiree are difficult, if not impossible, to calculate. Retiree claims that Defendants' use of Retiree's proprietary information is harming Retiree in an irreparable and incalculable manner by diminishing the novelty of Retiree's business model, by competing with Retiree in the decumulation segment of the retirement market, and by shifting recognition from Retiree to Anspach in professional, academic, advisor, and institutional circles. Retiree asserts that it cannot calculate the loss to its revenues, income, and goodwill resulting from Anspach's misappropriation.  Given the magnitude of the universe of potential consumers, Retiree cannot possibly determine the number or identity of individuals diverted by Anspach's efforts.  As Anspach has been marketing on the internet, her market is nationwide, if not international.  Similarly, given the magnitude of the immense universe of potential advisors, Retiree cannot know the number of advisors that may have lost interest in Retiree's business offer as a result of Anspach's promotion of her spreadsheet.  Lastly, Retiree cannot know which

---

[24]*United Tunneling Enterpr., Inc. v. Havens Constr. Co., Inc.*, 35 F. Supp. 2d 789, 794 (D. Kan. 1998) (citations omitted).

[25]*Id.* (citation omitted).

enterprises had harbored an interest in Retiree but either lost or diminished their interest.  While
Retiree could, perhaps, determine from one or more interested companies the loss of its going
concern value, Retiree can only speculate about the loss in the value of its goodwill attributable
to financial institutions' altered perspective on Retiree.

The Court must also determine whether the set amount of liquidated damages is
reasonable.  To determine whether a liquidated damages provision is an unenforceable penalty,
"the court must consider the whole contract, the situation of the parties, and the circumstances
surrounding execution of the contract."[26]  The provision will be enforced if the amount "is
reasonable in view of the value of the subject matter of the contract and of the probable or
presumptive loss if a party breaches the contract," and "actual damages resulting from the breach
wold not be easily or readily determinable."[27]  To recover liquidated damages, the amount must
have some reasonable relationship to the actual injury caused by the breach.[28]

Defendants argue that the liquidated damages clause is a penalty because there was no
attempt to calculate the amount of actual damages that might be sustained in the event of a
breach.  Defendants cite *Wichita Clinic, P.A. v. Louis*, for the proposition that if the amount of
damages is the same for minor or major breaches or total or partial breaches, it is evident the
parties did not attempt to calculate actual damages.[29]  Defendants claim that the Agreement
provides for $250,000 for each violation regardless of whether the breach is for minor or major

---

[26]*Wichita Clinic, P.A. v. Louis, D.O.*, 185 P.3d 946, 956 (Kan. Ct. App. 2008).

[27]*Id.* (citations omitted).

[28]*Id.* at 958.

[29]185 P.3d 946 (2008).

breaches or total or partial breaches.

Retiree alleges that there are two clear and significant breaches warranting liquidated damages.  One is Defendants' use of Retiree's confidential information to build their spreadsheet and utilize it to develop their business.  Second, is Defendants' disclosure of Retiree's confidential information to Retiree's competitors, including software providers Finance Logix and Social Security Timing.  Meyer then testified as to the reasonableness of the $250,000 figure in light of these two significant breaches.

Meyer testified that he had been negotiating with Finance Logix earlier in 2013 to license Retiree's IP and software, but the transaction never came to fruition.  Anspach presented her spreadsheet in her blog, her publications and to influential people through RIIA.  Anspach writes that Spreadsheet 2.0 is different from current planning projection modes, because of various technical aspects, including the ability to "[a]ccurately incorporate the taxation of Social Security and illustrate what percent of Social Security is subject to income taxes each year. (Finance Logix will be rolling out with this feature shortly – thanks to me.)"[30]

Retiree was also negotiating with a regional broker dealer based in Philadelphia who wanted to use Retiree's Social Security software and training for its advisors.  The deal did not come to fruition and the company licensed with Finance Logix instead.  Meyer testified that deals involving an enterprise license—the purchase of Retiree's software for use with the company's advisors—have significant monetary value, giving as an example an enterprise license that Retiree issued in 2012 for $270,000.  Meyer also testified as to deals involving advisor licenses—where each individual advisor would purchase a license for approximately

[30]Ex. 715 at p. 2.

17

$1000 per year— have significant monetary value and can be millions of dollars depending on the size of the organization.  Meyer also testified as to opportunities for potential investors in Retiree, that were dependent on the novel and unique nature of its Big Model and software.  The potential damages from these lost opportunities were significant and the damage to Retiree's goodwill is impossible to determine.

The Court finds that applying the liquidated damages clause to these two significant breaches is reasonable and the liquidated damages amount has a reasonable relationship to the actual injury caused by the breach.  The Agreement provides that:

> In the event that any of the provisions of this Agreement shall be held to be invalid or unenforceable in whole or in part, those provisions to the extent enforceable and all other provisions shall nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included in this Agreement.  In the event that any provision relating to the time period or scope of restriction shall be declared by a court of competent jurisdiction to exceed the maximum time period or scope such court deems reasonable and enforceable, then the time period or scope of restriction deemed reasonable and enforceable by the court shall become and shall thereafter be the maximum time period.[31]

Thus, the scope of the liquidated damages clause can be limited to these two significant breaches, as asserted by Retiree, and the unenforceability of the liquidated damages clause to minor or partial breaches will not invalidate the remaining scope of the provision.

Defendants also argue that $250,000 is unreasonable because a different number was negotiated in the proposed employment agreement.  However, the Agreement was to be superseded upon execution of the employment agreement,[32] pursuant to which Anspach would

---

[31]Ex. 1 at ¶10.

[32]Ex. 226.

have obtained ownership in Retiree.  It is easy to see how Retiree would have viewed its

exposure during the negotiation phase to be a higher risk as compared to its risk after Anspach

joined the company and obtained an interest in Retiree.

The Court finds that the liquidated damages clause is enforceable as set forth herein.

"The party challenging the provision bears the burden to prove the provision is an unenforceable

penalty."[33]  Defendants have failed to meet their burden.  The amount of liquidated damages

bears a reasonable relationship to the actual injury caused by the breach and the breach would

produce damages uncertain in amount and difficult to prove.

C.  Permanent Injunction

The Agreement provides that:

> In the event of a breach or threatened breach by Recipient of any
> of the provisions of this Agreement, Recipient agrees that
> Owner—in addition to and not in limitation of any other rights,
> remedies, or damages available to Owner at law or in equity—shall
> be entitled to a permanent injunction in order to prevent or restrain
> any such breach by Recipient or by Recipient's partners, agents,
> representatives, servants, Recipients, and/or any and all persons
> directly or indirectly acting for or with Recipient.[34]

Defendants cite *Weber v. Tillman*,[35] for the proposition that a liquidated damages

provision in a contract precludes injunctive relief.  However, the contract in *Weber* prohibited

the defendant from competing with plaintiff, or "[a]lternatively, [defendant could] elect to

practice medicine in the aforementioned area upon payment of an amount equal to six months

---

[33]*Wichita Clinic, P.A. v. Louis, D.O.*, 185 P.3d 946, 956 (Kan. Ct. App. 2008) (citation omitted).

[34]Ex. 1 at ¶7.

[35]913 P.2d 84, 88 (Kan 1996).

salary and bonus."[36]  Clearly, the contract in that case provided that the remedies were

alternatives.  In this case, the Agreement expressly provides that the permanent injunction

remedy is "in addition to and not in limitation of any other rights, remedies, or damages

available to Owner at law or in equity."[37]

The Court found in its Memorandum and Order granting a preliminary injunction that

Retiree is suffering a harm that cannot be cured by monetary damages.  In finding that Retiree

has shown irreparable harm, this Court relied on its previous decision holding that:  "Certainly, if

the disclosure allows a competitor to cut corners in the research and development process . . .,

the competitor will attain a competing product . . . much sooner, and it is this harm . . . that is

irreparable."[38]  In addition to the harm from the acceleration of Defendants' development of its

spreadsheet and business model, Retiree is also suffering harm due to the diminution of its

innovative position in the decumulations segment of the retirement industry.  The Court adopts

its reasoning set forth in its Memorandum and Order granting a preliminary injunction and finds

that the evidence at trial further supports Retiree's entitlement to a permanent injunction.

D.  Contempt

Retiree also seeks to hold Anspach in contempt for violating the Court's preliminary

injunction order, which ordered Defendants to discontinue use of their current Excel spreadsheet

and remove all material on their website that was created using the spreadsheet, in particular

---

[36]*Id*. at 87.

[37]Ex. 1 at ¶7.

[38]*Universal Engraving, Inc. v. Duarte*, 519 F. Supp. 2d 1140, 1150 (D. Kan. 2007) (quoting *Interbake Foods, LLC v. Tomasiello*, 461 F. Supp. 2d 943, 975 (N.D. Iowa 2006) (explaining that the disclosure of trade secrets may cause irreparable harm)).

their case studies page and The Free Report.[39]  Defendants were further enjoined from utilizing the developed Excel model in presentations, speaking engagements, books, and articles, and from using Social Security claiming strategies that they were exposed to while working with Retiree.[40]

Civil contempt may be used to compensate for injuries from noncompliance with a court order.[41]  Wilfulness is not an element of civil contempt.[42]  However, substantial compliance with a court's order is a defense to civil contempt.[43]  Generally, the court has broad discretion to use its contempt powers to ensure adherence to its orders.[44]  Retiree, as the movant, has the burden to show that Anspach disobeyed the terms of the injunction.[45]  If Retiree makes such a showing, the burden shifts to Anspach to show either that she did indeed comply with the order of the Court, or circumstances rendered it impossible for her to do so.[46]

Retiree claims that Anspach utilized the developed Excel model in her book, *Control Your Retirement Destiny*,[47] and that Anspach continues to promote and sell the book, which was

---

[39]Doc. 51 at 13.

[40]*Id.*

[41]*Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1318 (10th Cir.1998).

[42]*See Universal Motor Oils Co. v. Amoco Oil Co.*, 743 F. Supp. 1484, 1487 (D. Kan. 1990) (good faith not defense to civil contempt, although it may affect extent of penalty); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (because purpose of civil contempt is remedial, failure to comply need not be intentional).

[43]*Universal Motor Oils Co.*, 743 F. Supp. at 1487 (if violating party has taken "all reasonable steps" to comply with order, technical or inadvertent violations will not support finding of civil contempt).

[44]*See Rodriguez v. IBP, Inc.*, 243 F.3d 1221, 1231 (10th Cir. 2001).

[45]*See United States v. Ford*, 514 F.3d 1047, 1051 (10th Cir. 2008) (citing *Reliance*, 159 F.3d at 1315).

[46] *Id.* at 1051.

[47]Ex. 687.

published between the preliminary injunction hearing and the date the Court issued its order granting a preliminary injunction.  Retiree's suggestions in support of its motion sets forth the specific pages of the book that it alleges are in violation of the Court's order.[48]  Retiree also alleges that Anspach's About.com site is viewed by 200,000 people a month and references the book.

Meyer testified as to the use of the Excel model in Anspach's book.  Meyer conducted a detailed demonstration, comparing the model to pages in the book.  He used a current Spreadsheet from Anspach, focusing on the interface tab.[49]  The numbers or values in the interface tab were exactly the same as those used in the "Steve & Carol" case study in the book.  The case study starts in Chapter Two and concludes in Chapter Five, including representations in schedules and graphs.[50]  Retiree met its burden of showing that Anspach violated the Court's preliminary injunction order.

The burden therefore shifts to Anspach to show either that she did indeed comply with the order of the Court, or circumstances rendered it impossible for her to do so.  Anspach's testimony lacked a denial of her use of the enjoined Excel model.  Instead, she focused on errors in the book and the fact that she made her publisher aware of this Court's preliminary injunction order—issues irrelevant to whether or not she violated the Court's order.  Anspach has failed to meet her burden of showing compliance with the preliminary injunction or circumstances rendering it impossible to comply.

---

[48]Doc. 66 at 3–7.

[49]Ex. 331 (admitted only for purposes of the Motion for Contempt).

[50]*See, e.g.*, Ex. 687 at pp. 20, 156–64.

The Court finds that Anspach's continued promotion, publication and sale of the book violates the Court's preliminary, and now permanent, injunction.  Although the book was published prior to the Court entering its preliminary injunction, Retiree notified Anspach of the alleged violation after the Court entered its order.  Anspach shall cease any further production, promotion or sales of the book in its current form utilizing the developed Excel model, as well as any reference to the book in her marketing materials, blogs, websites or otherwise.  Retiree will be awarded its reasonable fees and expenses in pursuing the Motion for Contempt, as part of its fees and expenses set forth below.

D.  Costs and Attorneys' Fees

Retiree claims entitlement to fees and costs pursuant to the Agreement which provides that "[t]he losing party agrees to pay to the prevailing party all costs, including attorneys' fees, incurred in enforcing this agreement."[51]  Kansas law enforces these types of contract terms.[52]  The burden is on the party requesting the fees to show their reasonableness.[53]  Reasonableness is determined by applying the factors set forth in KRPC 1.5(a): (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the

---

[51]Ex. 1 at ¶9.

[52]*See Boston Hannah Int'l, LLC v. Am. Acad. of Family Physicians*, Case No. 10-2510-CM, 2012 WL 137870, at *9 (D. Kan. Jan. 18, 2012) (citing *Farmers Cas. Co. v. Green*, 390 F.2d 188, 192 (10th Cir.1968)).

[53]*Westar Energy, Inc. v. Lake,* 552 F.3d 1215, 1229 (10th Cir. 2009); *Westar Energy v. Wittig,* 235 P.3d 515, 532 (Kan. Ct. App. 2010).

time limitations imposed by the client or the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services, and (8) whether the fee is fixed or contingent.[54]  A trial judge, based upon experience and knowledge of the legal profession, is deemed an expert on attorney's fees and may draw on that expertise in rendering an award in a particular case.[55]  The determination of the reasonable value of attorney's fees lies within the sound discretion of the trial court.[56]

In ruling on the reasonableness of the time and labor expended in the litigation of this case, the Court must begin by determining the amount of hours reasonably expended on the litigation.  The burden is on the applicant to prove that the hours billed are reasonable "by submitting meticulous, contemporaneous time records that reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks."[57]  However, Retiree has not submitted evidence in the form of detailed, contemporaneous time records that the Court is required to review to determine if Retiree has established its reasonable attorneys' fees.  Accordingly, Retiree shall submit sufficient evidence to establish its reasonable attorneys' fees by July 7, 2014; Defendants may file a reply by July 21, 2014.

---

[54]*See Johnson v. Westhoff Sand Co.,* 135 P.3d 1127, 1135–36 (Kan. 2006).

[55]*Thoroughbred Assocs., LLC v. Kansas City Royalty Co., LLC,*  248 P.3d 758, 774 (Kan. Ct. App. 2011), *aff'd in part and rev'd in part* 308 P.3d 1238 (Kan. 2013).

[56]*See City of Wichita v. BG Prods., Inc.,* 845 P.2d 649, 653 (Kan. 1993).

[57]*Case v. Unified Sch. Dist. No. 233,* 157 F.3d 1243, 1250 (10th Cir.1998); *Kan. Penn Gaming, LLC v. HV Properties of Kan., LLC*, 790 F. Supp. 2d 1307, 1316 (D. Kan. 2011).

**IT IS THEREFORE ORDERED BY THE COURT** that the Court grants judgment to Retiree on its claim for a permanent injunction.  The Preliminary Injunction set forth in this Court's July 23, 2013 Memorandum and Order (Doc. 51) shall be permanent.

**IT IS FURTHER ORDERED BY THE COURT** that the Court will further grant judgment to Retiree on its claim for liquidated damages in the amount of $500,000.

**IT IS FURTHER ORDERED BY THE COURT** that Retiree's Motion for Contempt (Doc. 57) is **GRANTED**.

**IT IS FURTHER ORDERED BY THE COURT** that Retiree shall submit evidence of its reasonable attorneys' fees on or before **July 21, 2014**; Defendants shall respond on or before **August 4, 2014**.

**IT IS SO ORDERED.**

Dated: <u>July 2, 2014</u>                                   <u> S/ Julie A. Robinson </u>
                                                                          JULIE A. ROBINSON
                                                                          UNITED STATES DISTRICT JUDGE