## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **RETIREE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 12-2079-JAR** |
| | ) | |
| **DANA ANSPACH, and** | ) | |
| **SENSIBLE MONEY, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Plaintiff Retiree, Inc. ("Retiree") filed this action against Defendants Dana Anspach

("Anspach") and Sensible Money, LLC, seeking to permanently enjoin Defendants from

violating the parties' confidentiality and non-compete agreement (the "Agreement") and to

enforce the liquidated damages provision contained in the Agreement.  The Court previously

held an evidentiary hearing on Retiree's Motion for Preliminary Injunction, and entered a

Memorandum and Order granting the Motion for Preliminary Injunction.[1]  Following a bench

trial, the Court entered a Memorandum and Order granting judgment to Retiree on its claim for

a permanent injunction and on its claim for liquidated damages in the amount of $500,000, and

granting Retiree's motion for contempt (the "Decision").[2]  This matter currently comes before

the Court on Defendants' Motion to Alter or Amend Findings and Judgment, or Alternatively for

New Trial (Doc. 96).  The motion is fully briefed and the Court is prepared to rule.  As explained

more fully below, the Court denies the motion for a new trial and grants in part the motion to

---

[1]Doc. 51.

[2]Doc. 91.

alter or amend findings and judgment.  Defendants also requested oral argument pursuant to D.

Kan. Rule 7.2.  The Court finds that oral argument would not be beneficial and denies the

request.

## I.      Standards

### A.      Motion to Alter or Amend Findings

Under Fed. R. Civ. P. 52(b), a court "may amend its findings—or make additional

findings—and may amend the judgment accordingly.  The motion may accompany a motion for

a new trial under Rule 59."[3]  "A motion made pursuant to Rule 52(b) will only be granted when

the moving party can show either manifest errors of law or fact, or newly discovered evidence; it

is not an opportunity for parties to relitigate old issues or to advance new theories."[4]

### B.      Motion to Alter or Amend Judgment

Rule 59(e) permits a party to request reconsideration of a final judgment.[5]  "Grounds

warranting a motion to reconsider include (1) an intervening change in the controlling law,

(2) new evidence previously unavailable, and (3) the need to correct clear error or prevent

manifest injustice."[6]  "[A] motion for reconsideration is appropriate where the court has

misapprehended the facts, a party's position, or the controlling law."[7]  A motion to alter or

amend a judgment should be granted only "'to correct manifest errors of law or to present newly

---

[3]Fed. R. Civ. P. 52(b).

[4]*Blann v. Rogers*, Case No. 11-2711-CM, 2014 WL 6895592, *1 (D. Kan. Dec. 5, 2014) (citations omitted).

[5]Fed. R. Civ. P. 59(e).

[6]*Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

[7]*Id*.; *see also Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997).

discovered evidence.'"[8]  "Neither a Rule 59(a) nor a Rule 59(e) motion is the appropriate avenue

to revisit issues already considered or to argue matters not raised in prior briefs."[9]

### C.      Motion for New Trial

Under Fed. R. Civ. P. 59(a)(1)(B), a court may grant a new trial on all or some of the

issues on motion of a party "after a nonjury trial, for any reason for which a rehearing has

heretofore been granted in a suit in equity in federal court."[10]  Motions for new trial are

committed to the sound discretion of the district court.[11]  Courts do not regard motions for new

trial with favor and only grant them with great caution.[12]  A party seeking a new trial on newly

discovered evidence must show:

> (1) the evidence was newly discovered since the trial; (2) [the
> moving party] was diligent in discovering the new evidence; (3)
> the newly discovered evidence could not be merely cumulative or
> impeaching; (4) the newly discovered evidence [was] material; and
> (5) that a new trial, with the newly discovered evidence[, will]
> probably produce a different result.[13]

## II.    Discussion

Defendants argue that the Decision is the product of clear and manifest error, requiring

the Court to alter or amend its Decision; that the Court should grant a new trial based upon

newly discovered evidence; and that the Court's Decision is contrary to the great weight of the

---

[8]*Phelps*, 122 F.3d at 1324 (citations and quotations omitted).

[9]*Blann*, 2014 WL 6895592 at *2 (citing *Servants of Paraclete*, 204 F.3d at 1012; *Waugh v. Williams Cos., Inc. Long Term Disability*, 323 F. App'x 681, 684–85 (10th Cir. 2009)).

[10]Fed. R. Civ. P. 59(a)(1)(B).

[11]*See Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1193 (10th Cir. 1997).

[12]*Franklin v. Thompson*, 981 F.2d 1168, 1171 (10th Cir. 1992).

[13]*Joseph v. Terminix Intern. Co.*, 17 F.3d 1282, 1285 (10th Cir. 1994) (citations omitted).

evidence, requiring a new trial.  The Court will address each of Defendants' arguments.

A)    Whether Retiree's April 29, 2014 Patent on Social Security Claiming Strategies is Newly
      Discovered Evidence that Extinguishes a Significant Component of Retiree's Alleged
      Confidential Information.

The Court noted in its Decision that "Retiree has a patent pending on an algorithm to maximize Social Security benefits and to coordinate it with how someone withdraws in a tax-efficient way."[14]  Defendants argue that Retiree's patent application, although pending at the time of trial, was granted, issued and published on April 29, 2014, prior to the Court's Decision. Defendants argue that because the patent is now accessible through the USPTO web site and is of public record, it would produce a different result at trial.  Defendants allege that the patent discloses information to the public that Retiree has tried to label as confidential and that forms a substantial basis for the breach of contract claim.  Defendants argue that now Retiree could not claim the Social Security claiming strategies, or any other information disclosed in the patent, as "confidential information."  Defendants then cite *Forcier v. Microsoft Corp.*, for the proposition that the disclosure of a trade secret in a patent extinguishes a trade secret and "the patentee's only protection is that afforded under the patent law."[15]  Defendants claim that a new trial is warranted to allow them to establish the extent to which Retiree's alleged confidential information has been extinguished by the patent.

Defendants reliance on *Forcier* is misplaced.  The language cited by Defendants was in relation to the court's ruling on the plaintiff's claim for trade secret misappropriation against Microsoft, a third party who did not contract with plaintiff but rather purchased the product line

---

[14]Doc. 91 at 3.

[15]123 F. Supp. 2d 520, 528 (N. D. Cal. 2000).

4

and rights to pending patent applications from the party that entered into a nondisclosure agreement with plaintiff.[16]   Therefore, the court was not addressing a breach of contract claim, but rather a claim for misappropriation of a trade secret under California law.   Because California trade secret law required the element of secrecy, which the court found was gone by the time Microsoft acquired the information, the court denied the misappropriation of a trade secret cause of action against Microsoft.[17]

Retiree did not assert a cause of action under the Kansas statute adopting the Uniform Trade Secrets Act.[18]   Rather, Retiree claimed two clear and distinct breaches of the Agreement warranting liquidated damages: 1) Defendant Anspach's use of Retiree's confidential information to build Defendants' spreadsheet and utilize it to develop their business; and 2) Defendant Anspach's disclosure of Retiree's confidential information to Retiree's competitors, including software providers Finance Logix and Social Security timing.[19]   Both of these breaches occurred prior to the trial and prior to the grant of the pending patent application.[20]   Furthermore, Retiree introduced the Provisional Patent Application (Ex. 96) into evidence at the preliminary injunction hearing.[21]   Defendants could have cross-examined Retiree's representative at the

---

[16]*Forcier*, 123 F. Supp. 2d at 528.

[17]*Id.*

[18]*See* K.S.A. § 60-3326 (b)(1) ("This act does not affect: (1) Contractual remedies, whether or not based upon misappropriation of a trade secret.").

[19]Doc. 91 at 17.

[20]*Cf. Colyer v. Consol. Rail Corp.*, 114 F. App'x 473, 480–81 (3d Cir. 2004) (defining "newly discovered evidence" as facts existing at the time of trial and noting that if facts occurring after the trial were grounds for a new trial, litigation would never come to an end); and *Draim v. Virtual Geosatellite Holdings, Inc.*, 241 F.R.D. 48, (D.C. Cir. 2007) (finding that post-trial action by PTO was not newly discovered evidence because it was not evidence that was in existence when the trial took place).

[21]Doc. 39–2 at 5.

preliminary injunction hearing or later at the trial, regarding the exhibit, the content, scope, and effect of the patent (if granted), and the status and expected grant date. The grant of the patent represents merely the outcome of a process about which Defendants had ample notice and information.[22]

To the extent Defendants are arguing that the information disclosed in the patent prevents Retiree's Social Security claiming strategies from being protected by the permanent injunction, the Court will clarify the scope of the permanent injunction to address that argument. Retiree's processes and methodologies and software integrate numerous variables to determine how to minimize a retiree's tax burden to increase the longevity of the retiree's assets. Social Security claiming strategies is one variable.

Prior to her affiliation with Retiree, Anspach was using the Excel spreadsheet admitted as Exhibit 11 (her "Pre-Retiree Spreadsheet") and was using ExecPlan to run projections and generate an analysis. The Court previously found that Anspach's Pre-Retiree Spreadsheet "did not contain Social Security calculations—it did not coordinate Social Security claiming decisions with the sequencing of distributions from specific assets located in particular accounts."[23] The Court acknowledged that "Defendants do not use Retiree's Social Security algorithm, and instead use a calculator developed by another software provider."[24]

The Court's orders have referred to several of Defendants' post-Retiree spreadsheets.

---

[22]*See Grynberg v. Ivanhoe Energy, Inc.*, 490 F. App'x 86, 102 (10th Cir. 2012) (unpublished) (finding plaintiffs did not satisfy their burden to show they were diligent where although the evidence in question did not exist until after the order was issued, the underlying information it conveyed clearly did exist and seemingly could have been obtained sooner had plaintiffs been more diligent).

[23]Doc. 51 at 7–8.

[24]*Id.* at 7.

The spreadsheet Anspach was using at the time the Court entered its preliminary injunction order is admitted at Exhibits 300–304, and is referred to in the preliminary injunction order as Defendants' "new or current Excel spreadsheet" or the "developed Excel model.[25]"  Anspach's August 21, 2011 spreadsheet was admitted as Exhibit 12 and was more-evolved and "coordinated Social Security taxes with a withdrawal strategy through projections contained in base and optimal tabs, and employed a side-by-side comparison . . . Now Anspach has a control tab, which she calls the 'interface tab.'"[26]  The Court found that Anspach's spreadsheet was even more detailed at the launch of her Sensible Money website in January 2012, and this final version of Defendants' spreadsheet was referred to as "Spreadsheet 2.0" and was admitted as Exhibit 715.

The preliminary injunction order enjoined Defendants from using their current Excel spreadsheet, but also stated that "Defendants are further enjoined from using Social Security claiming strategies that they were exposed to while working with Retiree."  The Court is not enjoining Defendants from using their Pre-Retiree Spreadsheet, from using ExcePlan or from using a Social Security calculator developed by another software provider.  Anspach testified that she does not do Social Security claiming strategies on her own, because it is easier to plug numbers into a calculator that she subscribes to for $22 a month.[27]  She also testified that her current Spreadsheet 2.0 does not provide a Social Security claiming strategy.[28]

---

[25]The parties use the terms model and spreadsheet interchangeably, and in its orders, the Court does as well.

[26]Doc. 91 at 9.

[27]Transcript of Bench Trial, Vol. 2, November 7, 2013, at p. 507–08.

[28]Transcript of Bench Trial, Vol. 3, Nov. 8, 2013, at p. 623.

Defendants are enjoined from using their post-Retiree spreadsheets that utilized Retiree's processes and methodologies.  The Court previously found that Retiree's business model was based on its unique methodology and that this distinct business model is embodied and expressed through Retiree's Excel spreadsheet.[29]  The model coordinates the five factors set out in the Court's preliminary injunction order.[30]  Social Security claiming strategies is one factor.  Retiree's approach to financial planning integrated all of these factors and allowed a client to see, in real-time, how changing variables would affect their financial picture.  Unlike Retiree's side-by-side visualization, Anspach's Pre-Retiree Spreadsheets did not simultaneously show side-by-side comparisons nor generate a visualization that made it easy for clients to understand their options.  The Court's Decision explained that:

> During Anspach's affiliation with Retiree, Meyer explained to Anspach that there is no magic algorithm, but rather spreadsheets are patched together with detailed tax calculations and the engine of the Excel Model is the control tab, which is combined with a base and an optimized tab.  The user inputs data into the spreadsheet and has the ability to modify the input.  The input is then fed into a base projections spreadsheet and an optimized projections spreadsheet.  The base and optimized spreadsheets are projections over a retiree's projected longevity or the coordination of a number of variables to determine how long a retiree's assets will last.  The control tab feeds information into the arms of the engine and then the arms feed back into the control tab the results of the projections.  The results of those projections allow the control tab to generate a visual side-by-side comparison.  This allows the user to vary input to adjust the base and optimized outcomes.  This was all shown to Anspach during her affiliation with Retiree.[31]

---

[29]Doc. 51 at 5.

[30]*Id.*

[31]Doc. 91 at 8.

It is this methodology set forth above that Defendants are enjoined from using.  They are enjoined from using any of the Post-Retiree spreadsheets (Exhibits 12, 300–304 and 715) or any other spreadsheet or Excel model that utilizes this methodology that was shown to Anspach during her affiliation with Retiree (the "Post-Retiree Spreadsheets/Excel Models").

B)    Whether the Court Committed Clear and Manifest Error to the Extent it has Ruled that Sensible Money, LLC, is Liable for Breach of a Contract it was not a Party to.

Defendants argue that because Sensible Money, LLC is not a party to the Agreement, it cannot be sued for breach of the Agreement, it cannot be held liable for liquidated damages or attorneys' fees flowing from the alleged breach, and it cannot be a direct party to any injunction that prohibits a violation of the Agreement.  Defendants do not allege that the Court found Sensible Money liable for breach of contract, noting that the Court's findings focused on Anspach's breach.  Defendants merely argue that *to the extent it has ruled* that Sensible Money is liable for breach of contract the Court committed clear and manifest error.

The Court specifically found that "Anspach breached the Agreement."[32]  However, the Court granted judgment "to Retiree on its claim for liquidated damages in the amount of $500,000" without specifying that portion of the judgment was only against Defendant Anspach.  Because Defendant Sensible Money, LLC was not a party to the Agreement, the Court will clarify that the liquidated damages judgment and any award of reasonable attorneys' fees is against Defendant Anspach only.[33]

In contrast, to the extent Defendants are arguing that Sensible Money is not bound by the

---

[32]*Id.* at 11.

[33]*See Taffas v. Bridge Capital Investors II*, No. 90–1304–MLB, 1993 WL 339293, at *3 (D. Kan. August 23, 1993) ("It would be a novel holding for the court to rule that a breach of contract action can be maintained against a person who is not a party to the contract being sued upon.").

Court's permanent injunction, the Court finds this argument to be without merit.  Fed. R. Civ.

P. 65(d) provides that:

> **(2) *Persons Bound.*** The order binds only the following who
> receive actual notice of it by personal service or otherwise:
>> (A) the parties;
>> (B) the parties' officers, agents, servants, employees, and
>>     attorneys; and
>> (C) other persons who are in active concert or participation
>>     with anyone described in Rule 65(d)(2)(A) or (B).[34]

The Court has not only the power to enjoin parties to the litigation, but also those acting in

concert with such parties.[35]  There is no dispute that Sensible Money is acting in concert with

Anspach.  The purpose of this rule is to keep parties from "nullify[ing] a decree by carrying out

prohibited acts through aiders and abettors."[36]  The Court's injunction will apply with equal

force to Defendant Sensible Money.

C)   Whether the Court Committed Clear and Manifest Error When it Incorporated the Facts,
     Reasoning, and Findings of the Preliminary Injunction Hearing and Order.

The Court's Decision states that "[t]he Court's Memorandum and Order (Doc. 51) sets

forth the facts underlying this action and the Court will not restate them, but rather will

incorporate them and only set forth additional evidence presented at trial."[37]  The Decision also

noted that "[t]he Court found in its Memorandum and Order granting a preliminary injunction

that Retiree is suffering a harm that cannot be cured by monetary damages . . . The Court adopts

its reasoning set forth in its Memorandum and Order granting a preliminary injunction and finds

---

[34] Fed. R. Civ. P. 65(d)(2).

[35] *Hershey v. ExxonMobil Oil Corp.*, 550 F. App'x 566, 572 (10th Cir. 2013) (citing Fed. R. Civ.
P. 65(d)(2)(C)).

[36] *Id.* (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 13–14 (1945)).

[37] Doc. 91 at 2.

that the evidence at trial further supports Retiree's entitlement to a permanent injunction."[38]  The

Court further ordered that "[t]he Preliminary Injunction set forth in this Court's July 23, 2013

Memorandum and Order (Doc. 51) shall be permanent."[39]

Defendants argue that the Court violated Rule 65(d)'s requirement to "describe in

detail—and not by referring to the complaint or other document — the act complained of" by

impermissibly incorporating the facts, reasoning and findings of the preliminary injunction

hearing and order, rendering it impossible to determine precisely what evidence from trial now

serves as the basis for the permanent injunction.  Defendants acknowledge that Rule 65(a)(2)

provides that "[e]ven when consolidation is not ordered, evidence that is received on the motion

and that would be admissible at trial becomes part of the trial record and need not be repeated at

trial."  However, Defendants argue "that rule of efficiency does not allow a district court to adopt

the entire preliminary injunction hearing record without separating out the inadmissible

evidence."[40]

The Court found all of the findings from its Preliminary Injunction Order were relevant

and, along with the additional findings set forth in the Decision, served as the basis for the

permanent injunction.  The Court rejects Defendants' argument that the Court erred by failing to

separate out inadmissible evidence, because none of the evidence from the preliminary

injunction hearing was inadmissible.

The Court held a status conference on September 11, 2013, to discuss case management

---

[38]*Id*. at 20.

[39]*Id*. at 25.

[40]Doc. 97 at 9, n.2.

issues in preparation for the bench trial.  Defendants' attorney appeared and participated in the hearing.  The Court noted at the hearing that the Court had offered prior to the preliminary injunction hearing to fast-track the bench trial in lieu of conducting both a preliminary injunction hearing and a bench trial.  The parties rejected the Court's suggestion.  At the status conference, Plaintiff requested consolidation of the preliminary injunction hearing and the trial pursuant to Fed. R. Civ. P. 65.  The Court found that Rule 65 consolidation was no longer an option because the rule provides for consolidation "before or after beginning the hearing on a motion for a preliminary injunction."[41]  At that stage in the proceedings, the Court had already held the preliminary injunction hearing and entered its Memorandum and Order granting a preliminary injunction.  However, the Court went on to discuss the second part of Rule 65(a)(2), which provides that "[e]ven when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."[42]  The Court then stated:

> I am not aware of any of the evidence that I admitted at the PI stage that would not also be admissible at trial.  So I think that you all together could give me a list or just tell me that you agree that all of the exhibits that were admitted at the PI hearing are also admitted for purposes of this trial, which of course speeds things up to some extent.  But beyond that, at the trial, other than those admitted exhibits, I think you are called to, you know, call witnesses and all of that.[43]

At that point, the Court was informed that the parties had not conducted any further discovery since the preliminary injunction hearing, which left the Court even more dismayed that

---

[41]Fed. R. Civ. P. 65(a)(2).

[42]*Id.*

[43]Transcript of September 11, 2013 Telephone Conference, p. 12, l. 15–p. 13, l.1.

the parties had not accepted the Court's invitation to consolidate the proceedings.  Nonetheless,

the Court indicated that any additional evidence would be considered at the trial.

The Court also inquired about the estimated trial time, "given that all the exhibits will be

admissible and given what Rule 65 says about that."[44]  The Court then instructed counsel:

> So what we need to do between now and [the trial] is we need to
> be clear on which exhibits are admissible.  So what I'd like you all
> to do is put your heads together and let's say by October 21st give
> me a joint submission on which exhibits are not admissible of the
> ones that were previously admitted. . . . If you would just prepare
> trial notebooks that had all of the exhibits in that were admitted by
> either side before.  Okay?  Keep the same numbering because for
> the appellate record it would be easier to have the same, you know,
> numbering. . . . All of them that were admitted before will be
> admitted for purposes of trial.  If for some reason you think
> something shouldn't be admitted at trial, your only escape clause
> here in Rule 65 is that it wasn't admissible at trial.  But, frankly, I
> can't think what would fall in that category because I applied the
> same rules of evidence then that I would now. But if for some
> reason you think there's something strange that falls in that
> category, you're going to need to let me know by October 21.[45]

In addition, the parties' Pretrial Order provides at ¶ 4(d):

> The parties have stipulated to the admission of the following trial
> exhibits . . . (2) All documents introduced into evidence during the
> hearings held by the Court on November 13 and 15, 2012 and
> January 15 and 16, 2013.[46]

Defendants' argument, despite their stipulation in the Pretrial Order to the admission at

trial of all documents admitted at the preliminary injunction hearing and despite their further

failure to point to any evidence they considered inadmissible by the October 21 deadline as

---

[44]*Id*. at p. 15, l. 4–6.

[45]*Id*. at p. 23, l. 7–14, l. 25–p.24, l. 20.

[46]Doc. 59 at 2.

ordered by the Court, is puzzling.[47]

D)   Whether the Court Committed Clear and Manifest Error When it Entered the Permanent
     Injunction, Because the Permanent Injunction Violates Rule 65(d).

     **1. Vagueness**

Defendants argue that the permanent injunction is too vague and fails to state the terms of

the injunction "specifically" and otherwise "describe in reasonable detail . . . the acts restrained .

. ." Fed. R. Civ. P. 65(d) provides that:

> **(1)** ***Contents***.  Every order granting an injunction and every
> restraining order must:
>> (A) state the reasons why it issued;
>> (B) state its terms specifically; and
>> (C) describe in reasonable detail—and not be referring to
>> the complaint or other document—the act or acts restrained
>> or required.[48]

Under Fed. R. Civ. P. 65(d), an injunction must be specific in its terms and must describe in

reasonable detail the actions that it seeks to restrain.[49]  Although Rule 65 requires specificity, it

does not require excessive specificity, especially where such detail would, in effect, permit a

defendant to violate a plaintiff's rights through additional actions not expressed but plainly

covered.[50]  "[T]he specificity provisions of Rule 65(d) are no mere technical requirements. The

Rule was designed to prevent uncertainty and confusion on the part of those faced with

injunctive orders, and to avoid the possible founding of a contempt citation on a decree too

---

[47]One possible explanation could be that the attorney admitted pro hac vice after the trial for purposes of
drafting post trial briefs was not brought up to speed on the prior rulings in the case.

[48]Fed. R. Civ. P. 65(d).

[49]*Vallario v. Vandehey*, 554 F.3d 1259, 1268 (10th Cir. 2009).

[50]*Reliance Ins. v. Mast Constr. Co.*, 159 F.3d 1311, 1316–17 (10th Cir. 1998).

vague to be understood."[51]  "A preliminary injunction is vague only when 'the delineation of the proscribed activity lacks particularity or when containing only an abstract conclusion of law, not an operative command capable of enforcement.'"[52]  The Court finds that the permanent injunction set forth in this order is specific enough to comply with Rule 65(d).  Furthermore, the injunction order as a whole, along with the context of the litigation can be considered in determining whether the order is sufficiently specific.[53]  Rule 65 does not require the impossible, but if Defendants have any question about whether they are forbidden from taking a specific action, they may seek a clarification or modification.[54]

Defendants argue that the injunction is not narrowly tailored to remedy the harm shown, citing *Garrison v. Baker Hughes Oilfield Operations, Inc.*[55]  Defendants argue that the injunction prohibits Defendants from "using Social Security claiming strategies that they were exposed to while working with Retiree," which prohibition goes beyond the harm shown—Defendants' misappropriation of "the processes and methodology that underlay Retiree's software and practices."[56]  Defendants also argue that the prohibition regarding Social Security claiming strategies assumes that every single Social Security claiming strategy that Defendants ran across

---

[51]*Id.* (quoting *Schmidt v. Lessasrd*, 414 U.S. 473, 476 (1974)).

[52]*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1244 (10th Cir. 2001) (quoting *CF&I Steel Corp. v. United Mine Workers of Am.*, 507 F.2d 170, 173 (10th Cir. 1974)).

[53]*See Reliance Ins.*, 159 F.3d at 1316 (citing *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (considering text of order and context of litigation to determine whether order is sufficiently specific)).

[54]*Prairie Band*, 253 F.3d at 1243 (citation omitted).

[55]287 F.3d 955, 962 (10th Cir. 2002).

[56]Doc. 91 at 5.

during the time during which they were working with Retiree was the protected confidential and proprietary property of Retiree and is covered by the permanent injunction.  The Court has already clarified the extent of the permanent injunction as it relates to Social Security claiming strategies.

### 2. Duration

Defendants also argue that the permanent injunction lacks a time limit on its duration, citing *K2 Ski Co. v. Head Ski Co.*, for the proposition that "the appropriate duration for the injunction should be the period of time it would have taken [the defendant], either by reverse engineering or by independent development, to develop [the product] legitimately without use of [plaintiff's] trade secrets."[57]

A similar argument was made in *ClearOne Communications, Inc. v. Bowers*, where the appellants argued that the permanent injunction "has forever prohibited [them] from participating in the acoustic echo cancellation/noise reduction industry in any form or fashion anywhere and at any time."[58]  Appellants also argued that the "purported 'trade secret' could be reproduced by any party reasonably versed in audio/echo cancellation software in approximately three months, and could certainly be reproduced in less than a year."[59]  They argued that any unlawful "head start" they may have gained had "evaporated long ago," rendering the permanent injunction "ripe for dissolution."[60]  The Tenth Circuit rejected these arguments, finding that:

---

[57]506 F.2d 471, 474 (9th Cir. 1974).

[58]643 F.3d 735, 752–53 (10th Cir. 2011).

[59]*Id.* at 753.

[60]*Id.*

First, the record on appeal, including the jury's verdict, does not
support the Appellants' suggestion that an identical algorithm
could be developed from scratch in a year or less. Although Yang
made similar assertions during his testimony at trial, those
assertions were directly refuted by ClearOne's witnesses (who
indicated that development of an AEC algorithm is difficult and
can take years), and were likewise obviously rejected by the jury.
Further, the district court, in entering the original permanent
injunction against the WideBand defendants, expressly noted that
"it [wa]s exceptionally difficult to create a functional [AEC] code
and algorithm...." JA at D17508. Second, regardless of how long it
takes to develop a new AEC algorithm, the evidence presented at
trial refutes the Appellants' suggestion that they, or anyone for that
matter, could develop AEC software identical to the Honeybee
Code. As ClearOne's witnesses explained at trial, there are a host
of algorithmic and programming choices that can be made in
developing competing AEC software, making it difficult, if not
impossible, for two individuals working independently to produce
the same algorithm. Third, the district court's injunction does not
effectively prohibit the Appellants from working in the audio/echo
cancellation industry; rather, it simply prohibits them from making
use of ClearOne's trade secret, i.e., the Honeybee Code. Fourth,
Utah's Uniform Trade Secrets Act (UUTSA), under which
ClearOne proceeded, expressly provides for the imposition of
injunctive relief during the life of the trade secret at issue, as well
as "for an additional reasonable period of time in order to eliminate
commercial advantage that otherwise would be derived from the
misappropriation." Utah Code Ann. § 13–24–3(1). Finally, the
Appellants' post-trial contemptuous conduct clearly supports the
unlimited duration of the district court's injunction. In sum, we
conclude the district court did not abuse its discretion with regard
to the temporal restrictions (or lack thereof) of its injunction.[61]

Defendants did not offer any evidence to show what amount of time they would have

required to create the spreadsheet without the use of Retiree's confidential information.  Anspach

and Morton had worked together on spreadsheets for six years, and the uncontroverted evidence

---

[61]*Id.*

at trial showed that as of February, 2011 (before her association with Retiree) they could only identify missing pieces of their spreadsheet. Only after Retiree explained the operation of the Retiree spreadsheet could Defendants build their clone. Until Retiree can no longer benefit from the novelty, innovativeness, distinctiveness, use, and exploitation of its software, Defendants should not be able to infringe on Retiree's rights. At this time there is no way to determine when the benefit no longer needs protection, and the reasoning set forth in *ClearOne* is applicable in this case as well.

E)   <u>Whether the Court's Ruling on Trial Expert Testimony Was the Product of Clear and Manifest Error and Resulted in Manifest Injustice.</u>

Defendants allege that the Court erred in granting Plaintiff's motion in limine to exclude Defendants' expert witnesses that had not been timely disclosed, claiming that the Court's ruling resulted in manifest injustice to Defendants. Defendants argue that over their objection, the Court allowed Meyer to testify as an expert witness, on the very subjects of the excluded experts of Defendants, even though Meyer had not been disclosed as an expert. Defendants argue that this double-standard resulted in manifest injustice.

Defendants filed their final witness list on October 8, 2013, adding seven new witnesses that had not been previously disclosed.[62] Two of the newly listed witnesses—Kim Morton and Brian Duvall— are employees of Sensible Money that were expected to testify that Sensible Money's spreadsheet was developed without using any confidential information from any source, including Retiree. The Court allowed Morton and Duvall to testify. The other five witnesses, experts planning to testify regarding the "decumulation market," were excluded.

---

[62]*See* Doc. 68.

18

They were expected to testify that Retiree's approach—using a household basis asset location, asset allocation, withdrawal sequencing and Social Security claiming strategy to minimize taxes and thus increase the longevity of a retiree's assets—is not unique.

The Court rejects the argument that the Court erred and that the ruling resulted in manifest injustice.  The Court's Decision recognized that "[b]oth Meyer and Anspach were accomplished in their field; both are authors, as well as speakers in demand at various seminars and conferences in the financial planning field."[63]  If Meyer's testimony was considered expert testimony, so was Anspach's.  Defendants could rely on Anspach to supply the expert testimony just as they claim Meyer did.  The excluded expert testimony would have mirrored Anspach's testimony and added nothing in addition to her testimony and the voluminous exhibits about the industry and its participants already admitted into evidence.

Defendants did not list these expert witnesses on their initial disclosures under Rule 26(a), nor did they furnish supplemental disclosures under Rule 26(e).  Discovery closed on December 10, 2012.[64]  As a consequence, Plaintiff had no opportunity to investigate the facts, opinions or testimony of the expert witnesses or to conduct depositions.  The Revised Scheduling Order provides that:

> Supplementations of disclosures under Fed. R. Civ. P. 26(e) shall be served at such times and under such circumstances as required by that rule.  In addition, such supplemental disclosures shall be served 40 days before the deadline for completion of all discovery.  The supplemental disclosures served 40 days before the deadline for completion of all discovery must identify the universe of all witnesses and exhibits that probably or even might be used at trial.  The rationale for the mandatory supplemental disclosures 40 days

---

[63]Doc. 91 at 3.

[64]Doc. 59 at 6.

> before the discovery cutoff is to put opposing counsel in a realistic
> position to make strategic, tactical, and economic judgments about
> whether to take a particular deposition (or pursue follow-up
> "written" discovery) concerning a witness or exhibit disclosed by
> another party before the time allowed for discovery expires.
> Counsel should bear in mind that seldom should anything be
> included in the final Rule 26(a)(3) disclosures, which as explained
> below usually are filed 21 days before trial, that has not previously
> appeared in the initial Rule 26(a)(1) disclosures or a timely Rule
> 26(e) supplement thereto; otherwise, the witness or exhibit
> probably will be excluded at trial.[65]

Fed. R. Civ. P. 37(c)(1) provides that: "If a party fails to provide information or identify a

witness as required by Rule 26(a) or (e), the party is not allowed to use that information or

witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

substantially justified or is harmless."[66]  Defendants offered no explanation or justification for

why they did not disclose their experts by the deadline.  Furthermore, the Pretrial Order in this

case provides as follows: "**Motions Regarding Expert Testimony**.  Not applicable, i.e., the

parties have stipulated that no expert witnesses will testify in this case."[67]

F)    Whether the Court's Decision to Admit and Rely Upon Defendants' Attorney-Client
       Communication (Ex. 714) was the Product of Clear and Manifest Error and Resulted in
       Manifest Injustice.

Defendants allege that the Court's decision to admit Exhibit 714, and its subsequent

reliance on that exhibit in its Decision, was an abuse of discretion and resulted in manifest

injustice, because the exhibit was a privileged attorney-client communication.  Exhibit 714 is an

email from the client, Anspach, to Mr. Turco and Mr. Jacques, her lawyers, discussing the

---

[65]Doc. 22 at 3.

[66]Fed. R. Civ. P. 37(c)(1).

[67]Doc. 59 at 10, ¶ 15(c).

attached Spreadsheet 2.0 (Exhibit 715).[68]  Defendants listed Exhibit 714 on their Exhibit List

filed on October 8, 2013 as "6/1/13 Email to B. Jacques and A. Turco from D. Anspach re:

Spreadsheet 2- Retirement Income Timeline".[69]  On October 28, 2013, Defendants filed their

Revised Exhibit List, again listing the exhibit.[70]  Despite their listing the exhibit and providing a

copy to Plaintiff and the Court, Defendants argued at trial that Exhibit 714 was inadmissible as

an attorney-client privileged communication.  The Court allowed Exhibit 714 to be admitted

over Defendants' objection.  Later in the trial, Anspach testified about the exhibit and her

counsel attempted to offer the exhibit again for admission although it had previously been

admitted.[71]

       The Court finds that even if Exhibit 714 represents an attorney-client privileged

document and even if the privilege was not waived, admission of the exhibit does not constitute

clear error or result in manifest injustice warranting a new trial.  Fed. R. Evid. 103(a) provides

that "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a

substantial right of the party."[72]  Even if the Court admitted a privileged document, it was a

harmless error.  Consideration of Exhibit 714 did not materially effect the Court's ruling.  At the

preliminary injunction hearing, this exhibit was not introduced, yet the Court found a strong

---

[68]The Court notes that Defendants ask the Court to remove Exhibit 714 from the record or, in the alternative, have it placed under seal.  Doc. 97 at 14, n.9.  However, the admitted exhibits are not filed electronically with the Court and pursuant to D. Kan. Rule 79.3, admitted exhibits are transmitted to the Court of Appeals as part of the record on appeal, or if they remain in the clerk's custody more than 30 days after the time for appeal has expired or an appeal has been decided and mandate received, they may be returned to the parties or destroyed by the clerk if unclaimed after reasonable notice.

[69]Doc. 67 at 16.

[70]Doc. 82 at 15.

[71]*See* Transcript of Bench Trial, Vol. 3, November 8, 2013, p. 607–15 and p. 620–25.

[72]Fed. R. Evid. 103(a).

likelihood that Anspach had misappropriated Plaintiff's Excel model.

Moreover, Exhibit 714 was cumulative of other evidence, including Exhibit 118.  In Exhibit 714, Anspach asked her attorneys whether she should protect her Spreadsheet 2.0 because it was unique and had  "key differentiators." This of course was inconsistent with her testimony at trial that Plaintiff's spreadsheet, which her Spreadsheet 2.0 attempted to replicate, was not unique.  Similarly, in Exhibit 118, Anspach admitted that Plaintiff's methodology was proprietary and unique,[73]  again inconsistent with her testimony at trial that it was not unique.   In addition, Exhibit 118 demonstrated that Anspach had characterized Retiree's methodology as proprietary and unique. Exhibit 714, while explicit and detailed, was cumulative.   In short, in the absence of Exhibit 714, at the preliminary injunction hearing, the Court reached the same conclusion that it reached at trial.

G)     <u>Whether it was Clear and Manifest Error for the Court to Conclude that the Agreement is Enforceable Under Kansas Law.</u>

Defendants argue that the Agreement is unenforceable because its description of protected information is too vague; it contains no time limit on the injunction; it does not protect the "processes and methodology that underlay Retiree's software and practices;"and the liquidated damages provision is unenforceable as a matter of law.

**1. Vagueness**

Defendants argue that the Agreement seeks to protect "trade secrets, software products, software designs, specifications, processes, plans, or other ideas or inventions relating to the

---

[73]*See, e.g.*, Ex. 118 (On June 9, 2011, Anspach sent an email to her colleagues with the subject line "Announcement and Looking to Hire - Please forward along."  The email announces her merger with Retiree and states: "The interest they have generated has been due to their proprietary methodology for a retirement income drawdown process that coordinates tax planning, investment planning and Social Security benefit decisions in a way that extends the life of a retiree's savings an additional 4 to 7 years over traditional drawdown plans.").

financial services industry," and argues that the phrases are too general and that they can only be interpreted as applying to even publicly available information, which renders the Agreement unenforceable.

Again, Defendants are merely rehashing the same arguments previously rejected by the Court.[74]  The Court found that:

> although some ingredients in Retiree's processes are in the public domain, it is Retiree's product, as well as the processes and methodologies that underlay the product, that were novel and unique, integrating all of the components into a leading-edge approach that allowed the client to see, in real-time, how changing variables affected their financial picture.  Retiree's Big Model and software are the result of five years of development by experts in the field, Retiree has been awarded patents and has patents pending.  Clearly, there was nothing "general" about Retiree's leading-edge approach, and the covenants protect a legitimate business interest of Retiree.[75]

The categories of protected information—trade secrets, software products, software designs, specifications, processes, plans, or other ideas or inventions relating to the financial services industry—are not too general and clearly encompass Retiree's processes and methodology.  Plaintiffs note that no reasonable person would disclose with specificity the confidential information prior to execution of the protective agreement.  Only after receipt of the agreement will a disclosing party reveal to the receiving party valuable proprietary information.  A confidentiality agreement will inevitably contain and refer to abstract categories of information, not specifics.  Plaintiff further asserts that it has not attempted to prohibit Defendants from any and all Retiree business information, but only its confidential information

---

[74]*See* Doc. 91 at 12–13.

[75]*Id.* at 13.

that it defined in the course of Anspach's association with the company.

### 2. Duration

Defendants argue that under Kansas law, a restrictive covenant must contain a reasonable time limit or it is unenforceable as a matter of law, citing *Vasquez v. Ybarra*.[76]  Defendant argues that while the Agreement places a time limit on pirating Plaintiff's employees (one year) and on diverting customers (five years), there is no limitation on the duration of the confidentiality provisions.

The Court has already rejected Defendants' similar argument regarding the lack of a time limit on the permanent injunction.  The Court likewise rejects Defendants' argument that the Agreement is invalid for failure to contain a time duration limit on the nondisclosure provision.  Defendants cite *Vasquez*, where the court was considering causes of action that did not involve an agreement.  The court compared the case to those involving restrictive covenants in employment contracts, finding that Kansas courts would not allow plaintiffs more relief without an agreement than they would with an agreement.[77]  The court stated that a restrictive covenant is unreasonable and unenforceable if "the sole purpose is to avoid ordinary competition" and that "the covenant must contain area and time limitations which are reasonable *under the facts and circumstances of the particular case*."[78]  The court also distinguished the case by noting that unlike cases involving hiring agreements, the parties never agreed to keep the skills and information learned confidential, and they did not receive anything in consideration for such an

---

[76]150 F. Supp. 2d 1157, 1173 (D. Kan. 2001).

[77]*Id.*

[78]*Id.*  (emphasis added).

agreement.[79]  In the instant case, the parties did enter into an agreement, the parties were not competitors prior to their affiliation, and the Court has already found the facts and circumstances of this case render a permanent injunction reasonable.[80]

The Court rejects Defendants' argument that under Kansas law, a restrictive covenant must contain a reasonable time duration limit or it is unenforceable as a matter of law.  In fact, the Kansas Supreme Court has enforced a permanent injunction, with no time limit, against the violation of a confidentiality covenant.[81]  The Supreme Court narrowed the breadth of the language, but did not hold that nondisclosure covenants with unlimited duration are unenforceable under Kansas law.

3.  Whether the Agreement protects processes and methodology that underlay Retiree's software and practices.

Defendants argue that the "processes and methodology that underlay Retiree's software and practices" is not protected by the Agreement because nothing in the six generalized phrases is specific enough to include it.  The Court has already found that the categories of protected information—trade secrets, software products, software designs, specifications, processes, plans, or other ideas or inventions relating to the financial services industry—are not too general and clearly encompass Retiree's processes and methodology.

4.  Whether the liquidated damages provision is unenforceable as a matter of law.

Defendants argue that the liquidated damages provision is an unenforceable penalty

---

[79]*Id.* at 1174.

[80]*See Puritan-Bennett Corp. v. Richter*, 679 P.2d 206, 210 (Kan. 1984) (finding that "[i]n Kansas, it is well recognized that a restrictive covenant in an employment contract will only be applied to the extent it is reasonably necessary under the facts and circumstances of the particular case.").

[81]*Id.* at 206.

because it is security for performance.  Defendants are once again rehashing arguments that the

Court previously rejected.  "The burden of proving that a liquidated damages clause is in fact a

penalty falls on the party challenging the provision."[82]  The Court rejected Defendants'

arguments regarding the enforceability of the liquidated damages provision and the Court finds

nothing erroneous in its prior Decision.[83]

H)      Whether the Court's Conclusion that Defendants Appropriated the "Processes and
        Methodology that Underlay Retiree's Software and Practices" is the Product of Clear and
        Manifest Error and Contrary to the Great Weight of the Evidence.

        Defendants argue that the Court erred in finding that Retiree's "processes and

methodology that underlay Retiree's software and practices" were Retiree's protectable

confidential information, and in concluding that Anspach appropriated them.

        1.  Whether Retiree failed to prove that the "processes and methodology that underlay
        Retiree's software and practices" were protectable confidential information.

        Defendants argue that the Court failed to define what "processes and methodology that

underlay Retiree's software and practices" means, claiming that the Court does not identify

Retiree's five factors as the alleged "confidential information" that Defendants appropriated.

The Court has clarified that it is Retiree's methodology in utilizing the five factors in its Excel

spreadsheet that Defendants appropriated.  The Court previously found that Retiree's business

model was based on its unique methodology and that this distinct business model is embodied

and expressed through Retiree's Excel spreadsheets.  The model coordinates the five factors set

out in the Court's preliminary injunction order.

---

[82]*Wahlcometroflex, Inc. v. Westar Energy, Inc.*, No. 11-4017-EFM-JPO, 2012 WL 2366693, at *3–4 (D.
Kan. June 21, 2012).

[83]Doc. 91 at 14–19.

Defendants argue that the Court has in effect given Retiree a protectable interest in the functionality of an Excel spreadsheet, which they claim cannot be protected confidential information. Defendants state that "anyone with knowledge of Excel and the financial planning industry can create the spreadsheet the Court now says Defendants improperly created."[84]

The Court concluded that Retiree's spreadsheets (the Big Model and the Quickstart Model) embodied and underlay Retiree's methods and processes. Similarly, in its Decision, the Court concluded that Anspach's violations are from her appropriation of the processes and methods that underlie Retiree's software. As Meyer testified, the methodology and processes that underlie the spreadsheets involved detailed tax calculations and use of a central tab with integrated base and optimized tabs. Excel is a form of software, like Java or other software languages, and Retiree's developers spent at least five years in the build-out of the Excel language. Excel, by itself, is not completed software. The spreadsheets incorporate more than 500 Social Security claiming variations, which when combined with variables related to asset location, withdrawal sequencing, asset allocation, and tax calculations create innumerable analytical permutations.

Defendants want to characterize Retiree's spreadsheets as common off-the-shelf software on one hand, arguing that anyone with knowledge of Excel and the financial planning industry can create a similar spreadsheet. On the other hand, Defendants choose to point to the gaps and errors in their spreadsheets when arguing that they did not appropriate Retiree's spreadsheets. Moreover, Anspach has not characterized her spreadsheets as the result of the "Excel spreadsheet functionality."

---

[84]Doc. 97 at 25.

2.  Whether the Court Erred in Concluding that Defendant Anspach Appropriated the "Processes and Methodology that Underlay Retiree's Software and Practices.

Defendants argue that there is no direct evidence that Defendants used Retiree's confidential information and that circumstantial evidence—a comparison of Defendants' pre- and post-merger spreadsheets and the development timeline—cannot establish a breach of a confidentiality agreement, comparing reverse engineering in trade secret cases and citing *Evolution, Inc. v. Suntrust Bank*.[85]  The Court finds that Defendants are simply rehashing their arguments that were previously rejected by the Court.[86]

The Court rejects Defendants' argument and finds that the circumstantial evidence in this case was highly probative.[87]  Anspach and Morton worked together for six years prior to their association with Retiree and their spreadsheet (Exhibit 11) focuses on when, at current levels of spending, a retiree will consume all of the retiree's retirement assets.  It did not calculate how a retiree could extend the longevity of retirement assets through careful tax planning.  Exhibit 11 demonstrated all of the missing elements in Anspach's pre-Retiree spreadsheet.  With her background, training, and experience, in February, 2011 Anspach possessed a spreadsheet that has little, if any, similarity to Retiree's.  From February 2011 to July, 2011, Anspach testified that she was working practically full-time to assist Retiree and, in the meantime, was working practically full-time to maintain and service her clients.  During this time she was also winding down WMS, negotiating a merger with Retiree, and writing.  By August, one month after termination of her association with Retiree, Sensible Money had commenced and Anspach had

---

[85]342 F. Supp. 2d 943, 962 (D. Kan. 2004).

[86]*See* Doc. 91 at 13, n.18.

[87]*See Id.* at 9–11.

28

developed the core of the spreadsheet behind her January, 2012 website and Spreadsheet 2.0.

The Court found that

> [a]lthough it took Retiree over five years, using nationally
> recognized experts to develop a similar Excel model and business
> plan, in just six months . . . Anspach commenced a new business
> with a detailed plan, launched a website, created a new marketing
> strategy; and her spreadsheet evolved from considering and
> evaluating two tabs in a non-integrated fashion, to considering and
> evaluating multiple components in a somewhat integrated fashion
> through the use of her interface tab.[88]

I)      Whether Retiree failed to Carry its Burden to Establish Contempt and the Court's Ruling
        was the Product of Clear and Manifest Error.

The Court's Decision found that Anspach utilized her developed Excel model in her

book, *Control Your Retirement Destiny*, in contempt of the Court's preliminary injunction which

ordered Defendants to discontinue use of their current Excel model in books.  The Court found

that Retiree met its burden of showing that Anspach violated the Court's preliminary injunction

order by using the Excel model in her book.  The Court then found that the burden shifted to

Anspach to show either that she did indeed comply with the order of the Court, or circumstances

rendered it impossible for her to do so.  In her testimony at trial, Anspach did not deny using the

Excel model that had been enjoined.  Instead, she testified that there were errors in the book,

inferring that the model had to be the product of her work, not Retiree's.   She further testified

that the model did not contain any of Retiree's confidential information.  And, she testified that

she had made her publisher aware of this Court's preliminary injunction order.  The Court found

that Anspach failed her burden of proving that she had not violated the Court's order by using

---

[88]*Id*. at 10.

the enjoined Excel model.[89]

Defendants argue that the Court's refusal to allow Dr. Kotlikoff to testify on this issue resulted in manifest injustice.  Defendants assert that Dr. Kotlikoff's affidavit submitted in response to the motion for contempt unequivocally refutes the allegation that Anspach's book used Retiree's confidential information.  The Court disagrees.  The Court did consider Dr. Kotlikoff's affidavit with regard to the contempt motion and found it unpersuasive.  Dr. Kotlikoff declares that:

> In particular, I am familiar with and have reviewed figures 2-10 and 2-11 (pages 44 and 45) and figures 5-1 through 5-3 (pages 156-158).  These figures are not unique and every competent financial planner is familiar with the principles and objectives of these figures and most are routinely producing these types of figures for their clients.  Producing these types of figures, which has been going on for decades, requires no more than high school algebra, *the use of Excel*, and the application of the publically available IRS 1040 form and its tax tables as well as Social Security provisions.[90]

His opinion that her figures, principles and suggested strategies are not unique and are unremarkable is not the issue.  The issue was whether or not Anspach used the enjoined spreadsheet.  The affidavit, much like Anspach's testimony, does not suggest that she did not use her Excel spreadsheet and in fact reflects that an Excel spreadsheet was used.  Anspach testified that she used "one of our spreadsheet models" and instructed two of her employees to "input the information into our latest Excel model" and that they used "one of our spreadsheet models."[91]

---

[89]*See* Transcript of Bench Trial, Vol. 2, November 7, 2013, p. 502–03.

[90]Doc. 74–1 at 4 (emphasis added).

[91]Transcript of Bench Trial, Vol. 3, November 8, 2013, p. 593, ln. 25 through p. 594, ln. 1; p. 594, ln. 16–18; p. 597, ln. 19–20.

But she alleged that the spreadsheet did not contain any of Retiree's confidential information and she pointed out errors in her spreadsheet, as well as the lack of integration in the spreadsheet.[92] Meyer testified that Anspach had used the enjoined model; and in his testimony, Meyer conducted a detailed demonstration, comparing Anspach's model to pages in the book.  The Court did not err in granting the motion for contempt.

Prior to the trial, Retiree made an oral motion for leave to amend the complaint to add Anaday, LLC as a party defendant in connection with its motion for contempt.  The Court took the contempt motion and the oral motion under advisement, noting that if the Court heard evidence at trial warranting such amendment the Court would grant leave to amend during the trial.[93]  The Court inadvertently failed to rule on the oral motion in its Decision.  However, the Court did not hear evidence warranting leave to amend and finds it unnecessary to add Anaday as a defendant.[94]  Anspach testified that the contract with the publisher for the book was in her individual name, not with Anaday, LLC, although the proceeds from the book went into Anaday.[95]  In granting Retiree's motion for contempt, the Court awarded Retiree it's attorney fees incurred in prosecuting the motion for contempt; the Court did not award Retiree the proceeds of sales of the book.  For these reasons, the Court denies Retiree's request to add Anaday, LLC as a party.

---

[92]*Id*. at p. 597, ln. 12–15.

[93]Transcript of Telephone Conference on September 11, 2013, at p. 28.

[94]*See ClearOne Commc'ns, Inc. v. Bowers*, 651 F.3d 1200, 1215–16 (10th Cir. 2011) (adopting rule "that a district court may properly exercise personal jurisdiction over a nonparty for purposes of entering contempt orders, when the nonparty, with actual notice of an injunction order issued by the district court, and in active concert or participation with a party, violates that order.").

[95]Transcript of Bench Trial, Vol. 2, November 7, 2013 at p. 503.

III.    **Conclusion**

The Court denies Defendants' motion for a new trial.  The Court grants in part

Defendants' motion to alter or amend the Decision as follows: (1) to expressly set out the terms

of the permanent injunction; (2) to clarify that the judgment for liquidated damages is against

Defendant Anspach only; and (3) to deny the oral motion to add Anaday, LLC as a party

defendant.  The motion is denied in all other respects.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Alter

or Amend Findings and Judgment, or Alternatively for New Trial (Doc. 96) is **GRANTED IN**

**PART AND DENIED IN PART**.  Defendants' motion for a new trial is denied.  Defendants'

motion to alter or amend findings and judgment is granted in part and denied in part consistent

with this Memorandum and Order.

**IT IS FURTHER ORDERED BY THE COURT** that the Court grants judgment to

Retiree on its claim for a permanent injunction.

**IT IS FURTHER ORDERED BY THE COURT** that Defendants shall be permanently

enjoined from using their Post-Retiree Spreadsheets/Excel Models and shall remove all material

on their website that was created using these spreadsheets/models, in particular their case studies

page and The Free Report.  Defendants are further enjoined from utilizing their Post-Retiree

Spreadsheets/Excel Models in presentations, speaking engagements, books, and articles.

**IT IS FURTHER ORDERED BY THE COURT** that the Court will further grant

judgment to Retiree on its claim for liquidated damages in the amount of $500,000 against

Defendant Anspach.

**IT IS FURTHER ORDERED BY THE COURT** that Retiree's Motion for Contempt

(Doc. 57) is **GRANTED**.

  **IT IS FURTHER ORDERED BY THE COURT** that Retiree's Oral Motion to add

Anaday, LLC as a defendant is **DENIED**.

  **IT IS SO ORDERED**.

Dated: March 27, 2015

         S/ Julie A. Robinson    

        JULIE A. ROBINSON

        UNITED STATES DISTRICT JUDGE